**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| LEROY JEROME RICHARDSON, III, | : | Civil Action No. 1:23-cv-06926-DLC |
|  | : |  |
| Plaintiff, | : |  |
|  | : | **ECF CASE** |
| -against- | : |  |
|  | : |  |
| The NATIONAL BASKETBALL | : |  |
| ASSOCIATION and NBA SERVICES CORP., | : |  |
|  | : |  |
| Defendants. | : |  |
|  | : |  |
|  | : |  |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ......................................................................................1

STATEMENT OF FACTS ...........................................................................................2

    A.    The COVID Agreement Applicable To All Referees. .....................................2

    B.    Plaintiff's Request For A Religious Exemption Under The COVID Agreement. ....................................................................................................3

    C.    The NBA Interviewed Plaintiff In Connection With His Exemption Request. ..........................................................................................................5

    D.    Plaintiff's Exemption Request Was Denied Because It Was Not Driven By A Sincerely Held Religious Belief. .............................................................6

    E.    Plaintiff's Text Messages Obtained In Discovery Confirm That His Reasons For Not Getting Vaccinated Were Secular And Political. ...................7

    F.    Plaintiff Appealed The Denial Of His Exemption Request And The Arbitral Panel Affirmed The NBA's Decision. ...............................................7

    G.    Accommodating Plaintiff Would Have Caused Defendants An Undue Hardship. ......................................................................................................9

LEGAL ARGUMENT.................................................................................................10

    I.    Plaintiff Fully Litigated His Religious Discrimination Claim Before the VEB And Cannot Relitigate It Here. .......................................................................10

        A.    The CBA And the COVID Agreement Explicitly Cover Statutory Discrimination Claims, And Plaintiff Waived His Ability To Assert His Title VII Claim In This Court By Electing Arbitration. .................................10

        B.    Plaintiff's Claim Raised Before The VEB Is The Same Claim And Raises The Same Issues He Seeks To Relitigate Here. ...............................................11

    II.    Summary Judgment Should Be Granted Because Plaintiff's Exemption Request Was Driven By Secular And Political Beliefs Rather Than A Sincerely Held Religious Belief. ................................................................................................13

        A.    Plaintiff Bears The Burden Of Establishing That His Exemption Request Was Driven By A Sincerely Held Religious Belief. .......................................13

        B.    The NBA Correctly Concluded That Plaintiff's Exemption Request Was Not Driven By A Sincerely Held Religious Objection To The Vaccine. ........16

        C.    The VEB's Decision Further Supports Summary Judgment For Defendants. .................................................................................................18

        D.    Information Learned During Discovery Further Confirms That Plaintiff's Exemption Request Was Not Driven By A Sincerely Held Religious Belief....................................................................................................20

III.    Plaintiff's Religious Discrimination Claim Also Fails Because Permitting Him To Work Unvaccinated Would Have Posed An Undue Hardship To Defendants............21

    A.    Plaintiff Could Not Be Accommodated Because The Increased Risk Of Transmission Posed An Undue Hardship. .......................................................22

    B.    Permitting Plaintiff To Work Unvaccinated Posed An Undue Burden To Defendants Because It Risked Disruption To The NBA's Business. ..............25

IV.    Plaintiff Is Precluded From Receiving Back And Front Pay Because Plaintiff Has Made No Effort To Mitigate His Damages.................................................................27

CONCLUSION...............................................................................................................................28

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*14 Penn Plaza LLC v. Pyett*,
   556 U.S. 247 (2009)...................................................................................................10

*Acevedo v. Harvard Maint. Co.*,
   2021 WL 1224898 (S.D.N.Y. Mar. 31, 2021) ..........................................................10

*Alexander v. Gardner-Denver Co.*,
   415 U.S. 36 (1974)...............................................................................................18, 19

*Anastos v. Bos. Med. Ctr.*,
   2025 WL 275597 (D. Mass. Jan. 7, 2025)................................................................22

*Antredu v. Mass. Dep't of Youth Servs.*,
   2024 WL 1539725 (D. Mass. Apr. 9, 2024)..............................................................24

*Beaton v. Metro. Transp. Auth. N.Y.C. Transit*,
   2018 WL 1276863 (S.D.N.Y. Mar. 2, 2018) ............................................................19

*Beickert v. New York City Department of Education*,
   2023 WL 6214236  (S.D.N.Y. Sept. 25, 2023) ...................................................24, 26

*Bird v. Alanson M. Randol, D.D.S., P.C.*,
   2025 WL 553580 (D. Or. Feb. 19, 2025)..................................................................25

*Bob v. Madison Sec. Grp., Inc.*,
   2016 WL 6952259 (S.D.N.Y. Nov. 28, 2016)...........................................................21

*Bordeaux v. Lions Gate Entertainment, Inc.*,
   703 F. Supp. 3d 1117 (C.D. Cal. 2023) .......................................................24, 25, 26

*Cardwell v. Davis Polk & Wardwell LLP*,
   2023 WL 2049800 (S.D.N.Y. Feb. 16, 2023)......................................................27, 28

*Caviezel v. Great Neck Pub. Sch.*,
   701 F. Supp. 2d 414 (E.D.N.Y. 2010) .................................................................14, 15

*Chavis v. Wal-Mart Stores, Inc.*,
   265 F. Supp. 3d 391 (S.D.N.Y. 2017).......................................................................13

*Check v. N.Y.C. Dep't of Educ.*,
   2013 U.S. Dist. LEXIS 71223 (E.D.N.Y. Mar. 22, 2013).......................................16

*Collins v. N. Y. C. Transit Auth.*,
  305 F.3d 113 (2d Cir. 2002)...................................................................................19

*Cox v. Perfect Bldg. Maint. Corp.*,
  2017 WL 3049547 (S.D.N.Y. July 18, 2017) ......................................................10, 11, 12, 19

*Cox v. Valley Health System*,
  2024 WL 3236414 (W.D. Va. June 28, 2024).........................................................15

*EEOC v. United Health Programs of Am., Inc.*,
  213 F. Supp. 3d 377 (E.D.N.Y. 2016) ...................................................................13

*Friedman v. Clarkstown Cent. Sch. Dist.*,
  75 F. App'x 815 (2d Cir. 2003) ............................................................................14

*Gouveia v. Mount Sinai Health Sys., Inc.*,
  2023 WL 6386065 (S.D.N.Y. Sept. 29, 2023).........................................................19

*Greenway v. Buffalo Hilton Hotel*,
  143 F.3d 47 (2d Cir. 1998)................................................................................27, 28

*Groff v. DeJoy*,
  600 U.S. 447 (2023)...........................................................................................21

*Harris v. Univ. of Mass.*,
  557 F. Supp. 3d 304 (D. Mass. 2021) ..................................................................17, 18

*Hurley v. Varian Med. Sys.*,
  2024 WL 2368438 (E.D. Wis. May 23, 2024).........................................................14

*Int'l Soc. For Krishna Consciousness, Inc. v. Barber*,
  650 F.2d 430 (2d Cir. 1981)...............................................................................13

*Kennedy v. PEI-Genesis*,
  2025 WL 602159 (3d Cir. Feb. 20, 2025)..............................................................20, 21

*MacDonald v. Or. Health & Sci. Univ.*,
  2024 WL 3316199 (D. Or. July 5, 2024)................................................................21, 22

*Mason v. Gen. Brown Cent. Sch. Dist.*,
  851 F.2d 47 (2d Cir. 1988).................................................................................14, 15

*McDowell v. Bayhealth Med. Ctr., Inc.*,
  2024 WL 4799870 (3d Cir. Nov. 15, 2024)............................................................14

*McKinley v. Princeton Univ.*,
  2023 WL 8374486 (D.N.J. Dec. 1, 2023)..............................................................15

iv

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*,
  2015 WL 13699239 (S.D.N.Y. Mar. 25, 2015) ......................................................................28

*NM v. Hebrew Academy Long Beach*,
  155 F. Supp. 3d 247 (E.D.N.Y. 2016) ..................................................................................14

*Pender v. Dist. Council 37 of Am. Fed'n of State, Cnty. & Mun. Emps.*,
  223 F. Supp. 2d 534 (S.D.N.Y. 2002)..............................................................................19, 20

*Petersen v. Snohomish Reg'l Fire & Rescue*,
  2024 WL 278973 (W.D. Wash. Jan. 25, 2024)......................................................................24

*Philbrook v. Ansonia Bd. of Educ.*,
  757 F.2d 476 (2d Cir. 1985)..................................................................................................13

*Reilly v. Cisneros*,
  835 F. Supp. 96 (W.D.N.Y. 1993) ........................................................................................27

*Rolovich v. Washington State University*,
  2025 WL 48361 (E.D. Wash. Jan. 6, 2025)...........................................................................25

*Thomas v. Review Bd. of Ind. Emp. Sec. Div.*,
  450 U.S. 707 (1981)...............................................................................................................13

*Vargas v. City of Peeskill*,
  2023 WL 2648222 (S.D.N.Y. Mar. 27, 2023) .......................................................................20

*Vassel v. Greystone Bank*,
  2013 WL 2395980 (E.D.N.Y. May 31, 2013) ........................................................................12

**STATUTES**

Title VII of the Civil Rights Act of 1964............................................................................... *passim*

Defendants the National Basketball Association and NBA Services Corp. (together, the "NBA" or "Defendants") submit this memorandum of law in support of their motion for summary judgment.

## PRELIMINARY STATEMENT

Plaintiff Leroy Richardson ("Plaintiff"), a former NBA referee, asserts one claim of religious discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII") based on the denial of his religious exemption request from an agreement between NBA Services Corp., Plaintiff's employer, and the National Basketball Referees Association ("NBRA"), the union representing NBA referees, requiring that all NBA referees receive the COVID-19 vaccination. That agreement was memorialized in a Letter of Agreement between NBA Services Corp. and the NBRA dated August 28, 2021 (the "COVID Agreement"), which amended the collective bargaining agreement ("CBA") governing Plaintiff's employment.

In October 2021, the NBA denied Plaintiff's exemption request because he failed to demonstrate that it was driven by a sincerely held religious belief, but was instead based on secular and political reasons. Plaintiff appealed the denial to the Vaccine Exemption Board ("VEB"), an arbitral review panel provided for in the COVID Agreement. Following a full evidentiary hearing at which Plaintiff was represented by counsel, the VEB, in a thorough and well-reasoned written opinion, affirmed the NBA's decision and concluded that Plaintiff was not discriminated against under Title VII. Plaintiff's employment was terminated in September 2022, under the terms of the COVID Agreement because he did not get vaccinated.

Summary judgment is appropriate for several reasons:

***First***, Plaintiff's religious discrimination claim was fully adjudicated by the VEB, which issued a 15-page decision correctly finding that Plaintiff was "not discriminated against for his religious beliefs," and Plaintiff cannot pursue the same claim in this Court.

*Second*, the undisputed evidence demonstrates that Plaintiff has not met his burden of establishing that his exemption request was driven by a sincerely held religious belief, as he is required to do to qualify for protection under Title VII, but was instead based on secular and political beliefs.

*Third*, even if Plaintiff's exemption request was driven by his religious beliefs, allowing Plaintiff to work unvaccinated, including during basketball games where he would be unmasked in close proximity to others, would have posed an undue hardship based on the health and safety risks to players, referees, and other game participants and the disruption caused to the NBA's business operations.

*Finally*, to the extent that Plaintiff's claims are not dismissed, Defendants are entitled to summary judgment on Plaintiff's claims for back and front pay damages because he admittedly has made zero efforts to mitigate his damages.

### STATEMENT OF FACTS[1]

NBA Services Corp. is an affiliate of the National Basketball Association, a men's professional basketball league. (ECF No. 36 ¶¶ 4, 7.)  From 1995 to September 1, 2022, Plaintiff was employed by NBA Services Corp. as an NBA referee and was a member of the NBRA. (*Id.* ¶ 3.)

**A.      *The COVID Agreement Applicable To All Referees.***

In August 2021, the NBA and the NBRA negotiated the COVID Agreement applicable to all referees. (SF16-17.)  That Agreement – which amended the CBA and which Plaintiff voted in favor of ratifying – provided that all referees:

> be fully vaccinated with a CDC-approved vaccination against
> COVID-19 (including Pfizer, Moderna, or Johnson & Johnson) in

---

[1] Defendants incorporate by reference their Statement of Undisputed Material Facts.

> order to enter any league office or team facility, including any booster shot(s) recommended by the NBA's physician advisors, subject to the exemptions agreed to below.

(SF16, 18, 20, 33.)

The NBA and the NBRA agreed that the COVID Agreement was necessary "[t]o best protect the health of referees and other game participants and to minimize the likelihood of postponements . . . ." (SF19.)  Plaintiff is not challenging the legality of the COVID Agreement. (SF34.)

The COVID Agreement provided for exemptions for medical reasons or sincerely held religious beliefs. (SF19.)  To seek an exemption, a referee was required to notify the NBA of the request and submit whatever information they chose in support. (SF21-22.)   The COVID Agreement included health and safety protocols that applied to referees and also stated that NBA Services Corp. and the NBRA would periodically reassess those protocols. (SF29-31.)

The CBA provided referees the option to arbitrate statutory discrimination claims. (SF12-15.)  That provision was not modified or altered by the COVID Agreement. (SF16, 18.)  The COVID Agreement amended the CBA's provision for selecting a neutral arbitrator by creating the VEB – a three-arbitrator panel, including two party arbitrators and one jointly selected by the parties – to which a referee could appeal a denial of a religious exemption request. (SF23-25.)  The COVID Agreement provided that decisions of the VEB would be "final and binding." (SF26.)

**B.**     ***Plaintiff's Request For A Religious Exemption Under The COVID Agreement.***

In early-September 2021, Plaintiff, who is Christian, submitted a request for a religious exemption to Neal Stern ("Stern"), NBA Senior Vice President and Assistant General Counsel, which included three documents – a Vaccination Exemption Form (which Plaintiff generated from a website) and letters from two pastors, Dr. Roderick Hawthorne, Senior Pastor at Truth Transformation Ministries, with whom Plaintiff claims to have a longstanding personal and spiritual relationship, and Bishop Marcus D. Brown, Sr., a pastor at Tabernacle Church, where

Plaintiff has been a parishioner for approximately 15 years. (SF46-62.)[2]  Other than the three written documents and the information provided by Plaintiff during an interview with Stern and Melissa Dean Milne, then NBA Associate Vice President and Senior Associate Counsel, Plaintiff provided no further information in support of his request. (SF47.)

Upon receipt of the exemption request, Byron Spruell ("Spruell"), NBA President of League Operations reviewed the documents that Plaintiff provided. (SF63-65.)  The Vaccine Exemption Form submitted by Plaintiff did not identify his religion and simply stated: "I sincerely affirm that my religious beliefs prevent me from being vaccinated." (SF49-50.)

Spruell also reviewed the two pastoral letters. (SF64-65.)  The letter from Dr. Hawthorne made a generalized reference to "biblical scripture, tenets, and Christian ideology" and stated, in part, that "We believe the Covid-19 'vaccine' mandate is a condition and a 'float' test as to what practices and mandates could be implemented and the methods necessary to accomplish compliance in the future." (SF52-54.)

Bishop Brown's letter provided multiple, secular and political reasons for refusing vaccination:

- "Vaccination is **not morally obligatory** in principle and so must be voluntary."

- "A person is morally required to obey **his or her conscience.**"

- "If individuals have serious oral [*sic*] objections or health concerns about vaccines, those **concerns should be respected by society and government**, and those individuals should not be forced into vaccination, contrary to their conscience."

- "The **government should not impose** the COVID-19 vaccines on its citizens."

---

[2] The NBRA provided all referees, including Plaintiff, with advice on filing an application for a religious exemption, including that the "application be supported by documentary evidence confirming [] adherence to the religion in question" and that the referee bore "the burden of proof in establishing a sincerely held religious belief." (SF42-43.)

- "We believe the Covid 19 'vaccine' **mandate is conditioning and a 'float' test** as to what practices and **mandates** could be implemented and the methods necessary to accomplish compliance in the future."

(SF58-60, 62.)

Bishop Brown's letter explained that Tabernacle Church "does not prohibit the use of most vaccines" and, in fact, "generally encourages [vaccines] to safeguard personal and public health." (SF56, 58.)

On Spruell's initial review of these materials, he thought that Plaintiff had not established that his request was driven by a sincerely held religious belief. (SF65-66.)  Spruell asked Stern and Milne to interview Plaintiff to obtain additional information. (SF67.)

### C.    *The NBA Interviewed Plaintiff In Connection With His Exemption Request.*

On September 17, 2021, Stern and Milne interviewed Plaintiff via Zoom regarding his exemption request. (SF70-73.)  During the interview, Plaintiff tied the vaccine to what he described as an attempt to bring governments together into a one world government that controls the population through the COVID-19 virus, the use of vaccines, and mechanisms such as digital passports and vaccine registries:

- "[T]here is some overlap between what **government** stands for and how the religion feeds into it – why and where the virus came from[.]" (SF74-75.)

- "Revelations talks about the 'beast,' but actually talking about the rise of the **government** and one world . . . ." (*Id.*)

- "[D]ealing totally spiritually, the rising of beast is about **governments** to come under the control of one **government** to control the population and serve the anti-Christ." (*Id.*)[3]

Stern asked Plaintiff about the "float test" referenced in both pastors' letters. (SF76.)

Plaintiff again made multiple references to the government and explained that the "float test" was

---

[3] Plaintiff also stated: "now saying [people] don't need just a passport, need digital identification, need something that is not capable of being forged, for verification on another level[.]" (SF75.)

5

part of the effort of the one world government to assess the degree of control or conditioning that the government could exert over people, in particular, the African American community. (SF77-79.)  Plaintiff explained:

- "[T]hose left behind will be left to deal with the one world **government**[.]" (SF77.)

- "[T]he float test – you need to **condition** people to accept what you are putting into place" in connection with the one world government. (*Id.*)

Plaintiff also stated that "what we are seeing now is the natural hesitancy from the African-American community regarding the lack of trust in government." (*Id.*)  At no point during the interview – or in the materials he submitted in support of his exemption request – did Plaintiff tie the hesitancy of the African American community, or his hesitancy, to a religious belief.

Based on the totality of the information provided by Plaintiff in his written submission and during the September 17, 2021 interview, Plaintiff did not demonstrate that his objection to the COVID-19 vaccine was driven by a sincerely held religious belief, but instead was based on secular and political concerns – such as those about government control, government mandates, and government efforts to force the vaccine upon individuals, including the African-American community. (SF48-62, 74-79.)

**D.    *Plaintiff's Exemption Request Was Denied Because It Was Not Driven By A Sincerely Held Religious Belief.***

Stern shared his factual findings from Plaintiff's interview with Spruell. (SF80.)  Based on his own review of Plaintiff's submission and the information shared by Stern, Spruell concluded that Plaintiff had not established that his exemption request was based on religious – as opposed to secular and political – beliefs.  (SF81-82.)  On October 11, 2021, the NBA sent Plaintiff a letter denying his request. (SF83-84.)

6

**E.**     ***Plaintiff's Text Messages Obtained In Discovery Confirm That His Reasons For Not Getting Vaccinated Were Secular And Political.***

In text messages with ███████ sent prior to his September 2021 exemption request, Plaintiff provided multiple secular and political reasons for his anti-vaccination position, including distrust of the government and skepticism over the safety and efficacy of the COVID-19 vaccine, all of which he admitted to making at his deposition. (SF35-41.)  For example, Plaintiff wrote:

- "The Home Again Microchip reader is what they use to track your pets once they get the lost and found microchip injected in them. The reader is real, now we need to find out if it actually works with the covid injection." (SF37.)

- "I do believe Gates is central to the conspiracy theories. The ssn is actually the perfect individual identifier but it isn't global, the vaccine is a global initiative. They STILL haven't revealed the origin of the virus and yet the delta variant is designed to push those who haven't been vaccinated to do so . . . ." (SF38.)

- "[W]hat I know is I don't know what it is, where it came from, or why there is such a great push to take it. My scepticism [*sic*] is based on the lack of facts that makes me have to speculate. I'm done with EVERY shot, and the fact that all the other medications I have to take for blood pressure etc [*sic*] have come because this country has systemically and generationally poisoned us . . .I question the ENTIRE system . . . ." (SF39.)

- "It's agonizing but not as much as being forced to take a vaccine that not only hasn't received FDA approval, but that changes day to day under the auspices of such immortality [*sic*] and corruption in the world's government's [*sic*]." (SF41.)

**F.**     ***Plaintiff Appealed The Denial Of His Exemption Request And The Arbitral Panel Affirmed The NBA's Decision.***

Pursuant to §A.2 of the COVID Agreement and in accordance with the CBA provision that a referee may elect to arbitrate statutory discrimination claims (SF13-15, 25), Plaintiff, represented by counsel, appealed the denial of his exemption request to the VEB and elected not to pursue his claim in court (SF85-86.)  NBA Services Corp. and the NBRA engaged in a process to select the three members of the VEB panel, ultimately comprised of Margaret R. Brogan, Esq., Jeffrey A. Mishkin, Esq., and Brent Barnaky, Esq. (SF87, 90.)  Arbitrator Brogan – the neutral arbitrator selected by both parties – has been a full-time labor and employment arbitrator since 1990 and is

7

a past President of the National Academy of Arbitrators. (SF90-91.)  Arbitrator Mishkin was a partner at Skadden, Arps, Slate, Meagher & Flom LLP. (SF88.)  Arbitrator Barnaky, a current NBA referee, has experience as a civil trial lawyer. (SF89.)

On December 13, 2021, the parties, with counsel, participated in a full day hearing before the VEB, which included the presentation of documentary evidence and testimony (including cross-examination) under oath from seven witnesses. (SF92-105.)  Following the hearing, which was transcribed, the parties submitted post-hearing briefs and reply briefs totaling 88 pages. (SF93, 106.)  Plaintiff subsequently described his counsel's representation as "simply masterful" and his case as "impeccably presented." (SF113-14.)

After reviewing Plaintiff's exemption request *de novo*, "in line with federal law related to religious discrimination cases under Title VII" (SF98, 108), on February 8, 2022, the VEB issued a well-reasoned and detailed 15-page decision (SF107.)  It held that Plaintiff "was not discriminated against for his religious beliefs, practices or observance, and the NBA properly denied his request for a vaccination exemption." (SF109.)  In pertinent part, the panel concluded that the views espoused by Plaintiff in support of his exemption request – "his concerns about being controlled by the government, about being restricted in what he could do in society if he refused to be vaccinated, and about being required to have a vaccine ID which would mark him as someone who had been vaccinated . . . [and] the hesitancy of the African American community" – were based on social and political beliefs that do not qualify as religious beliefs within the meaning of the COVID Agreement and Title VII. (SF111-12.)  Pursuant to the COVID Agreement, the decision of the VEB is final and binding. (SF26, 98.)

8

On September 1, 2022, Plaintiff's employment was terminated pursuant to the terms of the COVID Agreement and CBA because he was not vaccinated and did not have an approved exemption. (SF83-84, 115-116.)

### G.    *Accommodating Plaintiff Would Have Caused Defendants An Undue Hardship.*

Even if Plaintiff's exemption request had been driven by a sincerely held religious belief, allowing Plaintiff to work unvaccinated would have caused an undue hardship – so he could not be accommodated.  During the 2021-2022 NBA season (shortly after the COVID Agreement was signed), the protocols in the COVID Agreement for unvaccinated referees became no longer sufficient to deal with the more transmissible Omicron variant. (SF117-197.) NBA referees work in indoor spaces, in close proximity to players, coaches, and each other. (SF3-4, 9-10.)  Their work on the playing court involves running, significant exertion, and the need to communicate effectively with players, coaches and officials at the scorers' table – all of which means that, while officiating games, referees are typically breathing heavily (and exposed to the heavy breathing of players) and cannot effectively work while wearing masks. (SF4, 157.)[4] Referees also regularly travel for their work assignments, including on commercial flights and taxis. (SF5-8, 181.)

Simply put, an unvaccinated referee was more likely to become infected with COVID-19, leading to greater risk of transmission of COVID-19 to NBA players and other game participants and of game cancellations and postponements, undermining the intent of the NBA and the NBRA in entering the COVID Agreement.  Accordingly, even if granted a religious exemption, Plaintiff could not be accommodated to work unvaccinated due to the undue hardship on the NBA. (SF117-197.)

---

[4] Referees also work in close proximity to one another in the referee locker room and the NBA Replay Center, an enclosed indoor space where referees and other NBA staff sit together during basketball games to review calls made by referees on the court. (SF9.)

9

## LEGAL ARGUMENT

**I.    Plaintiff Fully Litigated His Religious Discrimination Claim Before the VEB And Cannot Relitigate It Here.**

Plaintiff's religious discrimination claim is barred because it was already fully litigated before an experienced panel of arbitrators, which issued a comprehensive decision in favor of Defendants.  Plaintiff elected to appeal the denial of his exemption request to the VEB, claiming that it reflected discrimination against him because of his religion under Title VII.  After a full evidentiary hearing, the VEB concluded in a final and binding decision that Plaintiff "was not discriminated against" and that "the NBA properly denied his request for a vaccination exemption."  Plaintiff is bound by that decision and cannot now relitigate the same religious discrimination claim in court.

**A.    *The CBA And the COVID Agreement Explicitly Cover Statutory Discrimination Claims, And Plaintiff Waived His Ability To Assert His Title VII Claim In This Court By Electing Arbitration.***

It is well-settled that an arbitration award precludes a subsequent statutory discrimination claim – such as Plaintiff's Title VII claim here – where the "the collective-bargaining agreement's arbitration provision . . . expressly cover[s] statutory discrimination claims" and "clearly and unmistakably requires union members to arbitrate [statutory anti-discrimination] claims." *Acevedo v. Harvard Maint. Co.*, 2021 WL 1224898, at *7 (S.D.N.Y. Mar. 31, 2021) (citing *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 264 (2009); *Cox v. Perfect Bldg. Maint. Corp.*, 2017 WL 3049547, at *3 (S.D.N.Y. July 18, 2017)).  Here, the COVID Agreement and the underlying CBA were even more favorable to Plaintiff – they did not <u>require</u> arbitration of his Title VII claim, but gave him the <u>option</u> of having that claim heard by the VEB or a court.  Plaintiff chose arbitration before the VEB.  Under the terms of the CBA, that election constitutes a clear and unmistakable waiver of Plaintiff's religious discrimination claim in this Court.

The CBA governing Plaintiff's employment as an NBA referee explicitly provides for arbitration of statutory discrimination claims under Title VII: "[a]t the election of the grievant, any claims of [] discrimination, including, but not limited to a claim made pursuant to Title VII . . . may be subject to the grievance and arbitration procedures set forth in [the] agreement." (SF13.) It makes clear that "claims of discrimination" included religious discrimination. (SF12.)  The CBA provides that any referee who elects to pursue a discrimination claim through the grievance and arbitration procedure "***will be deemed to have waived his/her right to pursue all discrimination claims arising out of the same transaction or facts underlying the grievance in any forum other than in arbitration*** . . . ." (SF13 (emphasis added).)

The COVID Agreement expressly amended the CBA and provided that an individual could appeal an exemption denial to the VEB. (SF16, 18.)  It did not modify the CBA's waiver of the right to adjudicate discrimination claims outside of arbitration, which "remain[ed] in full force and effect." (SF18.)  Decisions of the VEB were expressly made "final and binding." (SF26.)

Accordingly, Plaintiff's Title VII claim was covered by the arbitration provisions in the CBA and the COVID Agreement, and his election to appeal to the VEB waived his right to bring the same claim in this forum.

### B.     *Plaintiff's Claim Raised Before The VEB Is The Same Claim And Raises The Same Issues He Seeks To Relitigate Here.*

Plaintiff seeks to litigate the same claim and raises the same issues that he already litigated before the VEB.  In evaluating parity between claims, courts consider if "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the [parties] or those in privity with them; [and] (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action. *Cox*, 2017 WL 3049547, at *4.  Courts regularly find that arbitration awards bar claims asserted in federal court if these factors are met. *Id*. (collecting cases).  In

11

determining parity of issue, courts consider if: "(1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding." *Vassel v. Greystone Bank*, 2013 WL 2395980, at \*6 (E.D.N.Y. May 31, 2013) (citation omitted).  Here, all of the foregoing factors are met.

It is undisputed that the VEB reached an adjudication on the merits.  It specifically considered whether the NBA discriminated against Plaintiff based on his religious beliefs, practices, or observance in denying his exemption request; reviewed the same evidence that underlies Plaintiff's claim here; and concluded that Plaintiff's exemption request was properly denied and Title VII was not violated. (SF92-114.)

It is undisputed that the parties to the proceeding before the VEB are also the parties to this action. (SF92.)[5]

It is undisputed that the religious discrimination claim asserted by Plaintiff before the VEB is the same claim asserted here (SF94-98, 108), and that the same issues that Plaintiff seeks to litigate here were determined by the VEB – whether Plaintiff was entitled to an exemption from the COVID Agreement based on a sincerely-held religious belief, and whether the NBA discriminated against Plaintiff in denying his exemption request (SF109-12.)

Lastly, the undisputed facts also establish that Plaintiff had a full and fair opportunity to litigate that issue.  Plaintiff was represented by counsel, who he described as "simply masterful" in presenting his case (SF97, 114), permitted to present all documentary evidence and witness

---

[5] *See Cox*, 2017 WL 3049547, at \*4 (privity where "the member belonged to the [union] at all relevant times, and the union was the sole and exclusive collective bargaining representative [for its members]") (internal quotations and citations omitted).

testimony in support of his claim (SF98-105), and had the ability to examine and cross-examine each witness (SF102). Both parties submitted post-hearing briefs and replies. (SF106.)

Plaintiff fully litigated his Title VII religious discrimination claim before the VEB and summary judgment should be granted in favor of Defendants because he cannot relitigate that claim here.

## II.      Summary Judgment Should Be Granted Because Plaintiff's Exemption Request Was Driven By Secular And Political Beliefs Rather Than A Sincerely Held Religious Belief.

The undisputed facts show that Plaintiff cannot carry his burden of demonstrating that his exemption request was driven by a sincerely held religious belief. Thus, summary judgment is appropriate.

### A.      *Plaintiff Bears The Burden Of Establishing That His Exemption Request Was Driven By A Sincerely Held Religious Belief.*

To establish a Title VII religious discrimination claim based on a failure-to-accommodate theory, Plaintiff bears the initial burden of proving his *prima facie* case, *i.e.*, that his decision not to get vaccinated was based on a belief that was both sincerely held <u>and</u> religious. *Chavis v. Wal-Mart Stores, Inc.*, 265 F. Supp. 3d 391, 398 (S.D.N.Y. 2017) (quoting *Philbrook v. Ansonia Bd. of Educ.*, 757 F.2d 476, 481 (2d Cir. 1985)).

Plaintiff's reason for not getting vaccinated must be rooted in religion, regardless of how sincere it is. *See Thomas v. Review Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 713 (1981). ("Only beliefs rooted in religion are protected[.]"); *Int'l Soc. For Krishna Consciousness, Inc. v. Barber*, 650 F.2d 430, 433 (2d Cir. 1981) ("[A] threshold inquiry into the 'religious' aspect of particular beliefs and practices cannot be avoided.")[6]

---

[6] To determine whether a belief is "religious," courts frequently cite to and rely upon First Amendment cases. *See EEOC v. United Health Programs of Am., Inc.*, 213 F. Supp. 3d 377, 393 (E.D.N.Y. 2016).

An accommodation request based on secular beliefs does not qualify for protection, even from a religious person. For example, in *NM v. Hebrew Academy Long Beach*, 155 F. Supp. 3d 247 (E.D.N.Y. 2016), there was no dispute that the plaintiff, a parent, and her children, were "devoutly religious." *Id*. at 258. However, the court found that the "evidence connecting this faith to [the] objection to vaccinating [the plaintiff's children was] tenuous" and based on non-religious beliefs. *Id*. (selective citations to the Torah's commandment to guard the body against disease insufficient, where plaintiff also asserted belief that nutrition can be the highest form of healing).

An individual's assertion that his belief is religious "does not, however, automatically mean that the belief is religious." *Mason v. Gen. Brown Cent. Sch. Dist.*, 851 F.2d 47, 51 (2d Cir. 1988). Similarly, the use of religious terminology or reference to bible passages does not automatically make a belief "religious." *Hurley v. Varian Med. Sys.*, 2024 WL 2368438, at *5 (E.D. Wis. May 23, 2024) ("Religious persons may reach many important decisions through prayer, but that does not turn every important decision into a matter of a sincerely held religious belief."); *McDowell v. Bayhealth Med. Ctr., Inc.*, 2024 WL 4799870, at *2-3 (3d Cir. Nov. 15, 2024). "Because a religious person may regard his personal, political, moral, or ethical beliefs as indistinguishable from his religious views, courts and employers must attempt to untangle these discrete threads because only religion is protected under Title VII." *Hurley*, 2024 WL 2368438, at *4. This untangling requires the Court to determine whether there is a "requisite nexus between the objection to immunization and plaintiff's religious beliefs." *Friedman v. Clarkstown Cent. Sch. Dist.*, 75 F. App'x 815, 818–19 (2d Cir. 2003).

Courts – including those in this Circuit – have dismissed religious discrimination claims on summary disposition where the plaintiff's exemption request was not driven by a sincerely held religious belief, but rather was based on secular concerns. *See Caviezel v. Great Neck Pub. Sch.*,

14

701 F. Supp. 2d 414, 430 (E.D.N.Y. 2010) (denying plaintiff's motion for preliminary injunction, holding plaintiff's "reluctance to have her daughter vaccinated does not arise from a religious belief, but from a personal, moral or cultural feeling against vaccination."), *aff'd*, 500 F. App'x 16 (2d Cir. 2012); *Mason*, 851 F.2d at 51-52 (affirming dismissal after bench trial, holding that although plaintiffs had "strong convictions," their beliefs were "philosophical and personal," and therefore not protected by law); *McKinley v. Princeton Univ.*, 2023 WL 8374486, at *4 (D.N.J. Dec. 1, 2023) (granting motion to dismiss religious discrimination claims where plaintiff's "basis for refusing to comply with the COVID-19 policies appear[ed] to be a personal or medical belief" that plaintiff "cloak[ed] with religious significance").

Cox v. Valley Health System *is instructive. 2024 WL 3236414, at *4 (W.D. Va. June 28, 2024). There, the plaintiff applied for a religious exemption from the defendant's COVID-19 vaccination requirement. *Id.*, at *1. The plaintiff claimed to be a Christian and connected her request to scripture, "[d]ivine counsel," and "deep prayer." *Id.*, at *1-2. However, she also tied her exemption request to patient autonomy and to "risks" regarding the vaccine. *Id.* In support of her request, the plaintiff submitted a pastoral letter, which stated that by taking the vaccine, she "would be elevating the government (and an employer's) rights to make decisions for their body above God's sovereignty over their life." *Id.* In granting defendant's motion to dismiss, the court held that although the plaintiff's request used religious terms and ideas, her "objections to the vaccine primarily rested upon her right to 'body autonomy' and 'patient rights,' rather than on her religious beliefs." *Id.*, at *4. The same conclusion should be reached here.

**B.**     ***The NBA Correctly Concluded That Plaintiff's Exemption Request Was Not Driven By A Sincerely Held Religious Objection To The Vaccine.***

The undisputed evidence establishes that Plaintiff's refusal to be vaccinated was based on secular and political, rather than religious, beliefs.  Plaintiff has the burden to establish a sincerely held religious belief drove his refusal to be vaccinated, and he has repeatedly failed to do so.

The first document that Plaintiff submitted in support of his exemption request – a "Vaccine Exemption Form" generated from a website (SF46, 48) – did not say what religion Plaintiff belonged to or why that religion prevented him from getting vaccinated. (SF49-50).  Other than stating his desire for an exemption, it provides no substantive support for his request.

The two pastoral letters Plaintiff submitted provided cursory assertions of religious jargon, but at their core articulated secular concerns about the vaccines. (SF51-62.) The letter from Dr. Hawthorne, although referencing Revelations, stated: "We believe the Covid-19 'vaccine' mandate is conditioning and a 'float' test as to what practices and mandates could be implemented and the methods necessary to accomplish compliance in the future." (SF54.)[7]

Bishop Brown's letter contained the exact same sentence regarding the "float test" as Dr. Hawthorne's letter. (SF62.)   It also made vague references to religious terms (*i.e.*, "Church teachings" and "biblical scripture, tenets, and Christian ideology" (SF58, 61), but did not tie those terms to Plaintiff's decision not to get vaccinated.  Rather, Bishop Brown's letter focused in great detail on a fear of government control and government mandates as a means of accomplishing further compliance by citizens in the future. (SF55-62.)[8]

---

[7] Pastor Hawthorne's letter provided little other information beyond making a generalized reference to "biblical scripture, tenets, and Christian ideology." (SF52-54.)

[8] Bishop Brown's letter evidenced that Plaintiff's belief also is motivated by other non-religious reasons, stating "[a] person's assessment of whether the benefits of a medical intervention outweigh the undesirable side-effects are to be respected . . . ." (SF59.)  Exemption requests based on health or scientific related concerns are routinely determined to be not religious. *See Check v. N.Y.C. Dep't of Educ.*, 2013 U.S. Dist. LEXIS 71223, at *22-25 (E.D.N.Y. Mar. 22,

Bishop Brown's letter also focused on vaccination as a moral decision, writing "[v]accination is not morally obligatory in principle . . ." and that "a person is morally required to obey his or her conscience." (SF59.)  He made clear that The Tabernacle Church – which Plaintiff belongs to – does not prohibit the use of most vaccines and, in fact, "generally encourages them to safeguard personal and public health" (SF56, 58), further demonstrating that Plaintiff's request was not based on religious belief. *See*, *e.g.*, *Harris v. Univ. of Mass.*, 557 F. Supp. 3d 304, 311, 314 (D. Mass. 2021) (denial of exemption because the Roman Catholic religion does not oppose vaccinations and publicly stated that vaccines are "morally justified"), *aff'd*, 43 F. 4th 187 (1st Cir. 2022).

Plaintiff confirmed the non-religious reasons set forth in his exemption request when Stern and Milne interviewed him.  During that interview, while Plaintiff used some religious terms and presented himself as an honest and religious person, Plaintiff espoused secular and political concerns for his decision (SF74-79), stating "what we are seeing now is the natural hesitancy from the African American community regarding the lack of trust in government." (SF77.)  Critically, Plaintiff never tied the hesitancy of the African American community to a religious belief. (*Id*.) Rather, he expressed that African Americans do not get vaccinated because they do not trust the government. (SF74-79.)

Further, while Plaintiff referenced Revelations and "Mark of the Beast" during that interview, he used the terms explaining that his exemption request was based on what he perceives as an attempt to bring governments together into a one world government to control the population through the virus, the use of vaccines, and mechanisms such as digital passports and vaccine mandates. (SF75-79.)  Plaintiff repeatedly identified his concern as government-related:

---

2013).

17

- "[T]here is some overlap between what **government** stands for and how the religion feeds into it – why and where the virus came from[.]" (SF75.)

- "Revelations talks about the 'beast,' but actually talking about the rise of the **government** and one world . . . ." (*Id.*)

- "[D]ealing totally spiritually, the rising of beast is about **governments** to come under the control of one **government** to control the population and serve the anti-Christ." (*Id.*)

With regard to the "float test" referenced in both pastors' letters (SF54, 62), Plaintiff again focused on the government, explaining that the float test was part of the effort of the one world government to assess the degree of control or conditioning that the government could exert over people. (SF76-79.)

Based on the information that Plaintiff provided, Spruell, the decision-maker, correctly determined – as the VEB also concluded – that Plaintiff's decision not to get vaccinated was driven by reasons other than religion. (SF80-84.)

## C.      *The VEB's Decision Further Supports Summary Judgment For Defendants.*

If this Court concludes that Plaintiff's religious discrimination claim is not waived, the VEB's decision should be afforded "great weight" in assessing whether Plaintiff has met his burden of proving that his decision not to get vaccinated was driven by a sincerely held religious belief.   In the Second Circuit, a decision by an independent arbitrator (like the VEB) is highly probative on summary judgment.  In considering the weight to be accorded to an arbitral decision, a court considers:

> the existence of provisions in the collective-bargaining agreement that conform substantially with Title VII, the degree of procedural fairness in the arbitral forum, adequacy of the record with respect to the issue of discrimination, and the special competence of particular arbitrators.

18

*Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 60 (1974).[9]

This is especially true for Title VII claims "[w]here an arbitral determination gives full consideration to an employee's Title VII rights" and "the issue is solely one of fact, specifically addressed by the parties and decided by the arbitrator on the basis of an adequate record." *Id.*

On a motion for summary judgment, a Title VII plaintiff who did not prevail at arbitration must present "strong evidence that the decision was wrong as a matter of fact -- *e.g.*, new evidence not presented to the tribunal – or that the impartiality of the arbitral proceeding was somehow compromised." *Collins v. N. Y. C. Transit Auth.*, 305 F.3d 113, 119 (2d Cir. 2002).  *Pender v. Dist. Council 37 of Am. Fed'n of State, Cnty. & Mun. Emps.*, 223 F. Supp. 2d 534, 543 (S.D.N.Y. 2002) is instructive.  There, the court concluded that the arbitrator's decision with respect to the plaintiff's statutory discrimination claim should be afforded "great weight" because the CBA provided the full protection of the statute and New York law; the proceedings had a high "degree" of procedural fairness; the proceedings were transcribed; each party had the ability to submit documentary evidence and did so; each party was able to examine and cross-examine witnesses under oath; plaintiff was represented by experienced union counsel; and the parties submitted post-trial briefs. *Id*. at 543.  Moreover, the experienced arbitrator provided a written opinion that was thorough and well-reasoned, giving full consideration to the plaintiff's statutory claim. *Id*. at 544.  *See also Gouveia v. Mount Sinai Health Sys., Inc.*, 2023 WL 6386065, at *5 (S.D.N.Y. Sept. 29, 2023) (granting summary judgment for defendant based on thorough arbitration proceeding); *Beaton v. Metro. Transp. Auth. N.Y.C. Transit*, 2018 WL 1276863, at *5-7 (S.D.N.Y. Mar. 2, 2018) (granting summary judgment for defendant and affording great weight to arbitrator's determination that

---

[9] *Gardner-Denver's* holding that a court may give "great weight" to an arbitral decision applies where a statutory claim was found not to be waived by an arbitration provision in a collective bargaining agreement. *Cox*, 2017 WL 3049547, at *3.

plaintiff was not discriminated against); *Vargas v. City of Peeskill*, 2023 WL 2648222, at *11-12 (S.D.N.Y. Mar. 27, 2023).

As in *Pender* and other decisions cited above, the VEB's decision should be afforded "great weight." The proceeding before the VEB, which was transcribed, was conducted before a panel that included a neutral third-party arbitrator. (SF87-93.) Both sides presented documentary evidence and sworn witness testimony and had the ability to cross-examine each of the seven witnesses. (SF97-105.) The parties each submitted post-hearing and reply briefs. (SF106.) Ultimately, the VEB issued a thorough 15-page decision, in which it analyzed all relevant facts and concluded that Plaintiff "was not discriminated against for his religious beliefs, practices or observance, and the NBA properly denied his request for a vaccination exemption." (SF107-114.) Plaintiff has not and cannot present strong evidence – as he is required to do to withstand a motion for summary judgment – that the arbitrator's decision was wrong as a matter of fact, or that the proceeding was not impartial.

### D.    *Information Learned During Discovery Further Confirms That Plaintiff's Exemption Request Was Not Driven By A Sincerely Held Religious Belief.*

Information produced by Plaintiff during discovery further establishes that his exemption request was grounded in secular and political, and not religious, concerns regarding COVID-19 vaccines. In text messages with ▮▮▮▮▮▮▮ exchanged and dated prior to his exemption request, Plaintiff provided multiple secular reasons for not taking the COVID-19 vaccine (SF35-41), including that the vaccine constituted a plan to implant microchips into the body (SF37), and that it had not been FDA approved (SF41).

In considering motions for summary judgment, courts routinely consider extrinsic evidence learned during discovery in determining that the plaintiff did not have a sincerely held religious belief. *See, e.g., Kennedy v. PEI-Genesis*, 2025 WL 602159, at *1 (3d Cir. Feb. 20, 2025) (finding

no reasonable juror could find that plaintiff had a sincerely held religious belief opposing COVID vaccination where plaintiff agreed with a friend's statement that the vaccine was "unsafe" and "dangerous" in text messages produced in discovery); *Bob v. Madison Sec. Grp., Inc.*, 2016 WL 6952259, at *8 (S.D.N.Y. Nov. 28, 2016).

*        *        *

For all of the foregoing reasons, summary judgment should be granted for Defendants.

### III.    Plaintiff's Religious Discrimination Claim Also Fails Because Permitting Him To Work Unvaccinated Would Have Posed An Undue Hardship To Defendants.

Even if Plaintiff's exemption request was driven by a sincerely held religious belief, permitting him to work unvaccinated would have posed an undue hardship to Defendants, thus providing an additional basis for summary judgment for Defendants.

"[U]ndue hardship is shown where a burden is substantial in the overall context of an employer's business." *Groff v. DeJoy*, 600 U.S. 447, 468 (2023).  For religious accommodation cases involving an exemption request from a COVID-19 vaccination policy, relevant considerations include:

> not only direct monetary costs but also the burden on the conduct of the employer's business—including, . . . the risk of the spread of COVID-19 to other employees or to the public. . . . Certain common and relevant considerations during the COVID-19 pandemic include, for example, whether the employee . . . works outdoors or indoors, works in a solitary or group work setting, or has close contact with other employees or members of the public (especially medically vulnerable individuals).

(Declaration of Elise M. Bloom In Support of Defendants' Motion for Summary Judgment ("Bloom Decl."), Ex. VV, at L.3).  Plaintiff's expert, Dr. Harvey Risch, agrees that these factors should guide the Court's determination. (Bloom Decl. Ex. WW, Risch Report, at 16-17.)

In considering these factors, the court is to "confine the analysis to the information available to the employer when it made its undue hardship decision." *MacDonald v. Or. Health &*

21

*Sci. Univ.*, 2024 WL 3316199, at *7 (D. Or. July 5, 2024) (granting summary judgment for defendant based on undue hardship) (*appeal pending*); *Anastos v. Bos. Med. Ctr.*, 2025 WL 275597, at *5 (D. Mass. Jan. 7, 2025) (granting summary judgment for defendant, holding that "the facts must be viewed from what was understood of the COVID-19 virus and the vaccines by the CDC in 2020-2021.") (*appeal pending*).

In the COVID Agreement, both NBA Services Corp. and the NBRA agreed that vaccination was necessary for two reasons – "[t]o best protect the health of referees and other game participants, and to minimize the likelihood of game postponements." (SF19.)  Permitting Plaintiff to work unvaccinated following the emergence of the Omicron variant would have posed an undue hardship with respect to both of those goals.  Particularly, the Omicron variant increased the risk of transmission of COVID-19, which increased the likelihood of substantial disruption to the NBA's business.

### A.    *Plaintiff Could Not Be Accommodated Because The Increased Risk Of Transmission Posed An Undue Hardship.*

The undisputed evidence demonstrates that Plaintiff could not be accommodated by working unvaccinated because of the increased risk of transmission.  The COVID Agreement, which was entered into on August 28, 2021, outlined certain health and safety protocols for the 2021-2022 NBA season applicable to a non-vaccinated referee who was granted a religious or medical exemption. (SF29-30.)  However, the COVID Agreement stated that these protocols would be periodically reassessed in light of COVID-19 case rates and other relevant factors. (SF31.)  Shortly after the COVID Agreement was signed, it became clear that the protocols laid out in the COVID Agreement were no longer sufficient to address the more transmissible Omicron variant, and that an unvaccinated referee could not safely officiate or perform other job duties due

22

to the increased health and safety risk. (SF117-197.)[10]

The Omicron variant was classified as a variant of concern in the United States in November 2021. (SF121.) It was much more infectious than previous variants and was associated with waves of increased reported COVID-19 infections in the United States throughout 2022. (SF122.) Hospitalizations reached their highest number across the United States due to the number of infections caused by Omicron. (SF123.)

Throughout the COVID-19 pandemic, COVID-19 infection rates have been consistently and significantly higher in unvaccinated individuals compared to vaccinated individuals. (SF131-134.) COVID-19 vaccines shorten infection durations, prevent against serious illness, hospitalization, and death, and protect against developing long COVID or post-COVID conditions. (SF135, 141-42.) No other COVID-19 prevention policy, such as testing, symptom screening, or masking, has proven consistently as effective at preventing COVID-19 transmission as compared to vaccination. (SF150-56.) From 2021 through 2022, guidance and reports from medical authorities supported that vaccination reduced the risk of infection, transmission, and severe illness. (SF171-78.)

Plaintiff's work duties fall squarely within the EEOC guidelines for finding an undue hardship. (*See* Bloom Decl. Ex. VV, at L.3.) Even Plaintiff's expert Dr. Risch admits, in applying the EEOC factors, that Plaintiff performed his duties in indoor spaces (basketball arenas, locker rooms, and the NBA Replay Center) where he worked in close proximity to others (including other referees, players, coaches and bench and table personnel). (Bloom Decl. Ex. K, Risch Tr., at 52:8-53:21; SF3-4, 9-10, 181, 195.) It is undisputed that Plaintiff could not wear a mask or other

---

[10] With this determination, no unvaccinated referee worked under the protocols outlined in the COVID Agreement.

protective equipment while officiating (SF157, 181, 195), when both referees and players are breathing heavily as a result of physical exertion of running up and down the floor.  Moreover, Plaintiff frequently travelled, including on commercial flights and taxis, increasing his risk of contracting COVID-19. (SF5-8, 195.)

Consistent with EEOC guidance, courts routinely hold that having an unvaccinated individual work indoors and/or in close proximity to other employees poses an undue hardship to the employer based on the increased risk of transmission of COVID-19.  For example, in *Beickert v. New York City Department of Education*, the court granted the defendant's motion to dismiss and held that allowing an unvaccinated teacher to work in close proximity to students posed an undue hardship because "[e]ven if [the plaintiff] took precautions such as wearing gloves, masks, and a face shield, her presence as an unvaccinated individual would have presented 'a risk to . . . other employees,'" and that "plaintiff's unvaccinated presence would have imposed 'substantial increased costs' . . . by creating a health and safety risk." 2023 WL 6214236, at *5 (S.D.N.Y. Sept. 25, 2023) (*appeal pending*); *Bordeaux v. Lions Gate Entertainment, Inc.*, 703 F. Supp. 3d 1117, 1134-35 (C.D. Cal. 2023), *aff'd* No. 23-4340 (9th Cir. Feb. 28, 2025) (granting summary judgment holding that an actress working on a film set while unvaccinated posed an undue hardship because her "work required close, unmasked contact with other performers on [the show] and potentially, members of the crew" and "this heightened risk of exposure could not have been mitigated by [p]laintiff wearing PPE, because filming required that she appea[r] in front of the camera without such gear."); *Antredu v. Mass. Dep't of Youth Servs.*, 2024 WL 1539725, at *5 (D. Mass. Apr. 9, 2024) (granting summary judgment based on undue hardship where unvaccinated plaintiff's position included in-person, one-on-one interactions); *Petersen v. Snohomish Reg'l Fire & Rescue*,

2024 WL 278973, at *6 (W.D. Wash. Jan. 25, 2024) (granting summary judgment because firefighters are unable to socially distance and cannot wear masks at all times).

This was especially true in late 2021 through 2022, when COVID-19 cases and hospitalizations were spiking across the country. *See Bird v. Alanson M. Randol, D.D.S., P.C.*, 2025 WL 553580, at *7 (D. Or. Feb. 19, 2025) (granting summary judgment based on undue hardship where "the information [the defendant] reviewed indicated that the Omicron variant was emerging and especially transmissible); *Bordeaux*, 703 F. Supp. 3d at 1135 (in late 2021 "roughly 2,000 deaths per day were attributable to COVID-19").

In a sports context, the Eastern District of Washington granted summary judgment to the employer in *Rolovich v. Washington State University* and held that the "[p]laintiff's job as head football coach undisputedly required frequent interactions with students, coworkers, donors, the media, and others" and "[t]his created an undue hardship for Defendant and no other possible accommodation would have negated that risk." 2025 WL 48361, at *3 (E.D. Wash. Jan. 6, 2025) (*appeal pending*).

The same conclusion should be reached in this case.

**B.      *Permitting Plaintiff To Work Unvaccinated Posed An Undue Burden To Defendants Because It Risked Disruption To The NBA's Business.***

From 2020 through 2022, Defendants experienced numerous game postponements and reschedulings caused by COVID-19, even after putting in place health and safety protocols for players and referees for those seasons. (SF198-199.)  Defendants were forced to postpone 31 games in the 2020-2021 season and 11 games in the 2021-2022 season due to COVID-19 exposure. (*Id.*)

Postponing and rescheduling games can impact fan perception of the NBA by disappointing fans who were planning to watch a game on a given night and are not able to attend

or watch the game on the rescheduled night. (SF205.) Postponing and rescheduling games also increases costs – such as arena set-up and team travel – and reduces revenue – such as ticket refunds or missed sales of food and beverage or merchandise (when fans cannot attend the rescheduled game). (SF201-204.) Media revenue can also be reduced. (SF204.) Postponing and rescheduling games may also decrease the quality of play in games because most postponed and rescheduled games are played on back-to-back nights, which can impact player performance. (SF206-08.)

The risks that Plaintiff posed by continuing to work unvaccinated are precisely what courts hold sufficient to establish an undue hardship. In *Bordeaux*, the court held that, in addition to the hardship posed to coworkers, the impact on production and the associated costs also posed an undue hardship. 703 F. Supp. 3d at 1135. Particularly, the court considered the "numerous logistical problems," including the time and expense in replacing cast and crew members who became incapacitated due to serious illness or death, and the risk of production delays, all of which would have resulted in costly adjustments to the plot of the production's second season. *Id*. Here, as in *Bordeaux*, Plaintiff could not wear a mask or other personal protective equipment while officiating a basketball game, and would be unmasked for several hours in close proximity to other referees, players, and game participants. (SF3-4, 9-10, 157, 181, 195.) *See also Beickert*, 2023 WL 6214236, at *5 (holding plaintiff's "unvaccinated presence would have imposed 'substantial increased costs' . . . by creating a health and safety risk") (*appeal pending*).

Based on Plaintiff's work duties and the increased transmissibility of the Omicron variant, the health and safety protocols originally provided for in the COVID Agreement were no longer sufficient to protect the health and safety of game participants, leading to greater risk of game cancellations and postponements, undermining the very purposes of the COVID Agreement.

26

(SF182-83, 186.)[11]  For this reason, in December 2021, a referee in the NBA G League (the NBA's minor league) had his religious exemption request approved (SF187-88), but that referee was not permitted to work games because the NBA G League determined, after consulting with medical experts, that there was no manner for him to safely participate in the 2021-2022 NBA G League season or in the 2022 NBA Summer League games. (SF189-97.)  Accordingly, because permitting Plaintiff to work unvaccinated would have posed an undue hardship to Defendants, Plaintiff could not be accommodated by working unvaccinated.

### IV.    Plaintiff Is Precluded From Receiving Back And Front Pay Because Plaintiff Has Made No Effort To Mitigate His Damages.

Even if Defendants' motion for summary judgment is not granted, summary judgment should be granted as to Plaintiff's claims for back and front pay, and Plaintiff should be precluded from seeking such damages, because he admittedly made no effort to mitigate his alleged damages.

A plaintiff asserting a discrimination claim under Title VII must mitigate his alleged damages. *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 53-54 (2d Cir. 1998); *Cardwell v. Davis Polk & Wardwell LLP*, 2023 WL 2049800, at *37 (S.D.N.Y. Feb. 16, 2023).  The plaintiff must use reasonable diligence to find other suitable employment. *Greenway*, 143 F.3d at 53-54.  A plaintiff who fails to adequately mitigate damages forfeits the right to back pay and front pay. *Reilly v. Cisneros*, 835 F. Supp. 96, 99 (W.D.N.Y. 1993), *aff'd*, 44 F.3d 140 (2d Cir. 1995).

While an employer typically has the burden to establish that a plaintiff failed to mitigate by showing that suitable work existed and the employee did not make reasonable efforts to maintain it, "[a]n employer . . . is released from the duty to establish the availability of comparable

---

[11] For instance, COVID-19 tests only detect the presence of COVID-19 at the specific point in time that the test is taken and do not result in viruses when the virus is present in the body but not yet at high enough levels to cause a test to be positive. (SF151.)  Individuals can be contagious with COVID-19 prior to testing positive or may test negative but become positive only a few hours afterward. (SF152.)  The accuracy of COVID-19 tests depends on the individual who is taking the test performing it accurately and can be compromised by human error. (SF153.)

employment if it can prove that the employee made no reasonable efforts to seek such employment." *Greenway*, 143 F.3d at 54.

Courts in the Second Circuit preclude plaintiffs from seeking back pay or front pay damages where the plaintiff admittedly made no effort to mitigate. *See, e.g.*, *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 2015 WL 13699239, at *1, 3, 4 (S.D.N.Y. Mar. 25, 2015) (granting summary judgment motion as to back and front pay damages where the plaintiff did not contact any potential employers, apply for any jobs, or go on any interviews, and finding that plaintiff contacting a recruiting firm, reviewing classified ads, and making a handful of calls to former colleagues did not constitute "a genuine effort to seek" employment); *Cardwell*, 2023 WL 2049800, at *38 (summary judgment as to back and front pay damages where the plaintiff did not apply to any jobs).

Here, it is undisputed that Plaintiff made ***no*** efforts to find other employment, and, in fact, admitted that he has not looked for ***any other employment*** since his exemption was denied and has no plans to look for a job in the future. (SF209-10.)  This is despite the fact that in addition to work unrelated to basketball, there are various available career paths unique to former NBA referees – including refereeing in other professional or amateur leagues and at the collegiate level, performing consulting work for NBA teams, and broadcast and analyst-type work – and, in fact, other former NBA referees have gone on to do such other work. (SF211.)

On these undisputed facts, summary judgment should be granted for Defendants as to Plaintiff's claim for back and front pay damages.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment should be granted and Plaintiff's Complaint dismissed with prejudice.

28

Dated: February 28, 2025
      New York, New York

PROSKAUER ROSE LLP


*/s/ Elise M. Bloom*
Elise M. Bloom
Michelle A. Annese
Jordan B. Glassberg
Eleven Times Square
New York, New York 10036
Tel. 212.969.3000
ebloom@proskauer.com
mannese@proskauer.com
jglassberg@proskauer.com

29

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies, pursuant to Local Civil Rule 7.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, that the foregoing brief contains no more than 8,750 words.

Specifically, the Microsoft Word "Word Count" tool indicates that the brief contains 8,715 words. That word count excludes the "caption, any index, table of contents, table of authorities, signature blocks, or any required certificates," but does include "material contained in footnote or endnotes." Local Civil Rule 7.1.

Dated:  February 28, 2025

/s/ Elise M. Bloom
Elise M. Bloom