```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
LEROY JEROME RICHARDSON, III,          :
                                       :
                           Plaintiff,  :    23cv6926 (DLC)
              -v-                      :
                                       :    OPINION AND
THE NATIONAL BASKETBALL ASSOCIATION,   :       ORDER
et al.,                                :
                                       :
                           Defendants. :
                                       :
-------------------------------------- X
```

APPEARANCES:

For plaintiff Leroy Jerome Richardson, III:
Steven Michael Warshawsky
Law Firm of Steven M. Warshawsky
118 North Bedford Road, Suite 100
Mount Kisco, NY 10549

Raymond Lee Hogge, Jr.
Hogge Law
500 E. Plume Street, Suite 800
Norfolk, VA 23510

For defendants The National Basketball Association and NBA
Services Corporation:
Guy Brenner
Proskauer Rose LLP
1001 Pennsylvania Ave NW, Suite 400 South
Washington, DC 20004

Elise Michelle Bloom
Jordan Benjamin Glassberg
Michelle A. Annese
Proskauer Rose LLP
11 Times Square
New York, NY 10036

DENISE COTE, District Judge:

Plaintiff Leroy Jerome Richardson, III, a basketball referee, has sued his former employer, NBA Services Corp. and the National Basketball Association (together, the "NBA") for a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII").  The defendants denied his request for a religious exemption from its requirement that all NBA referees be vaccinated during the 2021-22 season against COVID-19.  The parties have cross moved for summary judgment. For the following reasons, the defendants' motion is granted in part and the plaintiff's motion is denied.

## Background

The following facts are taken from the parties' submissions and are undisputed unless otherwise noted.  Only those facts necessary to decide the parties' motions are stated.

In brief, the National Basketball Referee Association ("NBRA") and the NBA executed an agreement on August 28, 2021 that required NBA referees to be vaccinated against COVID-19. The agreement provided an exception for referees with a sincerely held religious objection and created a Vaccination Exemption Board ("VEB") to which referees could appeal should the NBA deny a referee's exemption request.  On September 4, 2021, Richardson submitted a request for an exemption to the

COVID-19 vaccine requirement, which the NBA denied on October
11.  The VEB affirmed the NBA's decision on February 8, 2022.
Richardson was not permitted to serve as a referee during the
2021-22 season and his employment was terminated.  Richardson
filed this Title VII suit on April 13, 2023.  A description of
the documents and events critical to this lawsuit follows.

I.    NBRA Collective Bargaining Agreement

On August 26, 2015, the NBA and the NBRA entered into a
collective bargaining agreement ("CBA").  Article II, § 4 of the
CBA contains a "Non-Discrimination Clause" (the "Non-
Discrimination Clause") forbidding discrimination on the bases
of religion and other protected characteristics.  The Non-
Discrimination Clause includes an election-of-remedies provision
explaining that a referee may bring a Title VII claim either to
arbitration or to a court:

> At the election of the grievant, any claims of such
> discrimination, including, but not limited to, a claim
> made pursuant to Title VII of the Civil Rights Act
> ("Title VII"), . . . may be subject to the grievance
> and arbitration procedures set forth in Article XV of
> [the CBA]; provided, however, that if the grievant
> elects to pursue his/her claim (a) through the
> grievance and arbitration procedure, when the
> grievance is referred to arbitration in accordance
> with Article XV . . . the grievant will be deemed to
> have waived his/her right to pursue all discrimination
> claims arising out of the same transaction or facts
> underlying the grievance in any forum other than in
> arbitration (and will so confirm such waiver by
> signing the form annexed hereto as Exhibit B and

provising such form to the NBA's General Counsel
within five (5) days of the waiver) . . . .

Article XV of the CBA contains the CBA's grievance and
arbitration procedures.  It explains that a "grievance" is any
dispute involving the "interpretation or application of any
provision" of the CBA, excluding certain carve outs such as
disputes involving referee discipline.  Disputes referred to
arbitration are decided by a single arbitrator mutually agreed
upon by the parties.  The arbitrator's award must be in writing,
and constitutes a full and final disposition of the grievance,
binding upon the NBA, the NBRA, and any referees involved.

II.  COVID-19 Pandemic and the August 2021 COVID Agreement

COVID-19 is a novel virus for which the World Health
Organization declared a global pandemic in March 2020.  By April
2020, the United States had become the global leader in reported
deaths due to COVID-19.  To date, the COVID-19 pandemic has
caused over 7 million deaths.

In late 2020 into early 2021, two mRNA vaccines (Pfizer-
BioNTech and Moderna) and an adenoviral vector vaccine
(Janssen/Johnson & Johnson) (the "COVID-19 vaccines") became
available to the public in the United States.  Published data
compiled from state and local health agencies consistently
demonstrated that the COVID-19 vaccines proved effective in
reducing COVID-19 infection rates and in reducing the risk of

4

severe illness, including death.  For instance, in October 2021, widely published data showed that unvaccinated persons had five times the rate of infection compared with fully vaccinated people.

Following the emergence of the COVID-19 virus, the NBA finished the 2019-20 season later than usual.  As a result, it began its 2020-21 season in December, rather than October 2020, and played a shortened season of 72 games.  During that abbreviated season, which ran through July 2021, the NBA postponed 31 games due to COVID-19-related exposure events.

On or around August 28, 2021, the NBA and the NBRA executed a seven-page Letter of Agreement Amending CBA For Duration of 2021-22 Season (the "COVID Agreement").  It provides that "[e]xcept to the extent expressly modified by [the COVID Agreement], the terms of the CBA will remain in full force and effect."

The COVID Agreement required all referees to "be fully vaccinated with a CDC-approved vaccination against COVID-19" including "any booster shot(s) recommended by the NBA's physician advisors" in order to "enter any league office or team facility."  This was done "[t]o best protect the health of referees and other game participants, and to minimize the likelihood of game postponements."  A referee who refused to be

vaccinated would be suspended without pay or medical benefits for the period of up to one year, and if the referee was not vaccinated by September 1, 2022, their employment with the NBA would be terminated "without cause."

The COVID Agreement provided for exceptions from the vaccine requirement in cases of "an approved health or sincerely held religious exemption."  An individual who received such an exemption would be required to submit to COVID-19 testing "at least daily and at least twice on game days" and would also have to wear a face mask at league offices and team facilities, other than during on-court basketball activities or while showering, eating, or drinking.  There were also restrictions on the activities in which unvaccinated referees could engage, even while at home, and public venues they could enter.

The COVID Agreement did not reference Article XV of the CBA's grievance and arbitration procedure.  Rather, it explained that in the event the NBA denied a referee's exemption request, the referee "may appeal the exemption denial" within seven calendar days to the VEB.  The VEB consisted of one Board member selected by the NBRA, one Board member selected by the NBA, and a third "jointly selected" Board member.  The COVID Agreement authorized the VEB "to review requests for exemptions solely due to medical reasons or sincerely held religious belief(s),

practice(s), or observance."  It states that "[d]ecisions by the VEB addressing these issues will be final and binding."

Finally, under the COVID Agreement, the NBRA and the NBA agreed to "confer periodically to reassess the protocols and appropriate protections" for referees.  This would be done "in light of facts that would include," but would not be limited to: COVID-19 case and vaccination rates within the NBA population and team markets; vaccine efficacy against any new COVID-19 variants; the percentage of game participants who are either fully vaccinated or recently recovered from a prior infection; any actual or suspected transmission among referees; health and safety protocols applicable to other game participants; and the potential for modified protocols to reduce independent infections and/or spread of COVID-19 among referees.

III. Richardson's Exemption Request and Denial

After the COVID Agreement was executed, the NBRA Executive Board emailed NBA referees to explain that they should submit any application for an exemption to the NBA's COVID-19 vaccination mandate by email to Neal Stern, NBA Senior Vice President and Assistant General Counsel.  On September 4, 2021, Richardson emailed Stern to apply for a religious exemption. Richardson's request included three documents: a "Vaccine Exemption Form," dated September 4, 2021; a letter from Dr.

Roderick Hawthorne, Senior Pastor at Truth Transformation Ministries in Portsmouth, Virginia, dated September 1, 2021; and a letter from Bishop Marcus D. Brown, Sr., a pastor at Tabernacle Church in Portsmouth, Virginia, dated September 3, 2021.

Stern forwarded Richardson's three documents to Byron Spruell, NBA President of League Operations, who was responsible for evaluating NBA referees' religious exemption requests. Spruell requested that Stern and Melissa Dean Milne, then-NBA Associate Vice President and Senior Associate Counsel, interview Richardson to gain additional information, which they did on September 17.

After he received Stern's summary of the September 17 interview, Spruell determined that Richardson's exemption request was not based on a sincerely held religious belief. Accordingly, on October 11, Spruell emailed Richardson a memorandum denying his exemption request.

Richardson appealed the NBA's decision to the VEB that same day.[1]  On December 13, Richardson and the NBA participated in a full day hearing before the VEB.  Richardson was represented by

---

[1] The NBA selected a retired Partner of Skadden, Arps, Slate, Meagher & Flom LLP, to serve as a member of the VEB, and the NBRA selected a current NBA referee and former attorney.  The NBA and NBRA agreed upon a past President of the National Academy of Arbitrators as the third member of the VEB.

counsel to the NBRA.  Following the December 13 hearing, the
parties submitted briefs and reply briefs.

The VEB panel issued a decision affirming the NBA's denial
of Richardson's exemption request on February 8, 2022.  One
panel member dissented.  The majority opinion concluded that
Richardson's beliefs regarding the COVID-19 vaccine did not
qualify as religious beliefs entitled to protection under Title
VII.

Richardson did not work as an NBA referee for the 2021-22
season or seek any other employment.  In a letter dated
September 1, 2022, the NBA terminated Richardson's employment as
an NBA referee pursuant to both the COVID Agreement and Article
X, § 5 of the CBA, which provides for termination of employment
"without good cause."

IV.  Procedural History

Richardson initiated this action on April 13, 2023.  The
First Amended Complaint ("FAC") pleads a single claim for
violation of Title VII.  It seeks, among other things, back pay,
front pay, reinstatement, and costs.

Following the completion of discovery, the parties filed
cross-motions for summary judgment, and the NBA moved to exclude
the opinions and testimony of the plaintiff's expert, Dr. Harvey

Risch.  The three motions became fully submitted on April 22, 2025.

## Discussion

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Material facts are those facts that "might affect the outcome of the suit under the governing law."  Choi v. Tower Rsch. Cap., LLC, 2 F.4th 10, 16 (2d Cir. 2021) (citation omitted).  "[S]ummary judgment must be rejected if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Indemn. Ins. Co. of N. Am. v. Unitrans Int'l Corp., 98 F.4th 73, 77 (2d Cir. 2024) (citation omitted).

The court's role with respect to a summary judgment motion "is not to resolve disputed questions of fact but solely to determine whether, as to any material fact, there is a genuine issue to be tried."  Moll v. Telesector Res. Grp., Inc., 94 F.4th 218, 227 (2d Cir. 2024) (citation omitted).  The court must "review the record taken as a whole," and "may not make credibility determinations or weigh the evidence."  Id. (citation omitted).

I.   Waiver of Statutory Claims

As a threshold matter, the NBA contends that the COVID Agreement is an enforceable arbitration agreement and that Richardson's voluntary appeal to the VEB bars him from bringing his Title VII claim in federal court.  This argument fails.

Where a valid arbitration agreement exists, it must be rigorously enforced according to its terms.  Am. Exp. Co. v. Italian Colors Rest., 570 U.S. 228, 233 (2013).  "As in any contractual negotiation, a union may agree to the inclusion of an arbitration provision in a collective-bargaining agreement in return for other concessions from the employer."  14 Penn Plaza LLC v. Pyett, 556 U.S. 247, 257 (2009).  Where a collective bargaining agreement includes an arbitration provision, the "arbitrator's power is both derived from, and limited by, the collective-bargaining agreement," and the arbitrator's "task is limited to construing the meaning of the collective-bargaining agreement so as to effectuate the collective intent of the parties."  Id. at 263 (citation omitted).  This follows more generally from the proposition that, in all circumstances, "arbitrators wield only the authority they are given" by the parties' private agreement to arbitrate.  Lamps Plus, Inc. v. Varela, 587 U.S. 176, 184 (2019); see also Benihana, Inc. v. Benihana of Tokyo, LLC, 784 F.3d 887, 897 (2d Cir. 2015).

11

Parties may thus "shape" such agreements "by specifying with whom they will arbitrate, the issues subject to arbitration, the rules by which they will arbitrate, and the arbitrators who will resolve their disputes." Varela, 587 U.S. at 184.

The preclusive effect of an arbitration award rendered pursuant to a collective bargaining agreement thus depends on the scope of the parties' agreement. If a collective bargaining agreement grants the arbitrator authority to resolve "only questions of contractual rights, his decision could not prevent the employee from bringing the Title VII claim in federal court regardless of whether certain contractual rights are similar to, or duplicative of, the substantive rights secured by Title VII." Pyett, 556 U.S. at 262 (citation omitted). This is true whether the "legal theory of preclusion advanced by the employer" rests on "the doctrines of election of remedies" or is "recast" instead as resting on "the doctrine of equitable estoppel and on themes of res judicata and collateral estoppel." Id. An arbitration award may not preclude subsequent statutory actions unless the agreement to arbitrate "expressly covers both statutory and contractual discrimination." Id. at 264.

Here, the parties dispute whether the COVID Agreement barred Richardson from bringing a Title VII claim in court after he elected to appeal to the VEB. It did not. It did not

contain a sufficiently clear waiver of the right of NBA referees to pursue statutory claims in federal court.  Consequently, Richardson's lawsuit is not barred by the availability of an appeal to the VEB or by his decision to appeal to the VEB.

While the COVID Agreement offered referees the opportunity to appeal to the VEB, it did not warn them that such an appeal would deprive them of the right to litigate a claim against the NBA much less a federal statutory claim.  For instance, it did not contain the detailed description that appears in the CBA of the election of remedies available to referees and the consequences of electing the grievance and arbitration procedure, including the waiver of the right to pursue statutory claims in "any forum other than in arbitration."  Nor did the COVID Agreement refer to or incorporate by reference the CBA's election-of-remedies provision.

The NBA advances two arguments.  First, it notes that the COVID Agreement expressly amended the CBA and did not modify the CBA's election-of-remedies provision.  While that is true, the COVID Agreement does not expressly incorporate either that election-of-remedies provision or the CBA's grievance and arbitration procedure.  It created a separate process to respond to the exigencies presented by the COVID-19 pandemic.  The CBA's election-of-remedies provision applied explicitly to the CBA's

grievance and arbitration procedure.  Nothing in the COVID
Agreement served to give notice that the parties had agreed that
the CBA's election-of-remedies provision would apply as well to
the COVID Agreement's separate process.

Second, the NBA argues that Richardson's appeal to the VEB
raises the "same" claim as the one he advances here, citing case
law articulating res judicata principles.  See Sikorsky v. City
of Newburgh, New York, 136 F.4th 56, 62 (2d Cir. 2025).  The
COVID Agreement recognized an exemption for "sincerely held
religious belief(s), practice(s), or observance," which tracks
the standard formulation for religious accommodations recognized
by Title VII.  See 42 U.S.C.A. § 2000e(j); see also Gardner-
Alfred v. Fed. Rsrv. Bank of New York, 143 F.4th 51, 63 (2d Cir.
2025).  The VEB, moreover, cited and relied on Title VII
jurisprudence in reaching its decision.  Thus, there is a
substantial argument that Richardson has already had a full and
fair opportunity to litigate, under Title VII standards, whether
his reasons for refusing vaccination were sincerely held
religious beliefs.

But, as the Court of Appeals recently observed, an
arbitration agreement "does not alter or abridge substantive
rights; it merely changes how those rights will be processed."
Flores v. New York Football Giants, Inc., 2025 WL 2349199, at *5

(2d Cir. Aug. 14, 2025) (citation omitted).  The COVID Agreement would have had to say more than it did to reflect an agreement among the parties that statutory rights were waived when a referee chose to pursue an appeal to the VEB.  It would have been entirely reasonable to understand the COVID Agreement as a well-intentioned process to provide both the NBA and referees with a fair process to resolve vaccination disputes quickly without affecting any party's substantive rights.

II.  Title VII

Title VII makes it illegal for employers to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion."  42 U.S.C. § 2000e-2(a)(1). Employers are required to accommodate an employee's religious observances, practices, and beliefs unless doing so would constitute an "undue hardship on the conduct of the employer's business."  42 U.S.C. § 2000e(j).

The NBA moves for summary judgment on two grounds.  It first contends that summary judgment is appropriate because Richardson's exemption request was not based on a sincerely held religious belief.  It also seeks summary judgment based on the assertion that an accommodation of an unvaccinated referee would have constituted an undue hardship.  Its motion regarding the

15

sincerity of Richardson's religious belief is denied; its motion regarding undue hardship is largely granted.

A.    Sincerity of Richardson's Beliefs

A plaintiff bringing a "religious discrimination claim" under Title VII must first establish a prima facie case by showing that "(1) she held a bona fide religious belief conflicting with an employment requirement; (2) she informed her employer of this belief; and (3) she was disciplined for failure to comply with the conflicting employment requirement." Russo v. Patchogue-Medford Sch. Dist., 129 F.4th 182, 185-86 (2d Cir. 2025) (citation omitted). A bona fide religious belief is one that is "sincerely held." Gardner-Alfred, 143 F.4th at 63.

The "sincerity analysis seeks to determine an adherent's good faith" in the expression of his religious beliefs, and to "differentiate between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud." Id. (citation omitted). A religious adherent may hold both "religious" and "secular objections" to an employer's policy. Id. What inferences to draw from the presence of both religious and secular objections -- i.e., whether or not a plaintiff is "fraudulently hiding secular interests behind a veil of religious doctrine" -- is ordinarily the job of the jury. Id. At 63-64 (citation omitted).

16

Moreover, evidence that a plaintiff may have acted inconsistently with his religious beliefs does not necessarily render the plaintiff's beliefs insincere.  Id. at 64.  In most cases it is for a jury to determine whether such impeachment evidence discredits the plaintiff's testimony.  Id.

There exists a genuine dispute of material fact as to whether Richardson's espoused religious beliefs are sincerely held.  Richardson affirms that his religious beliefs prevent him from being vaccinated.  In support, he attached letters from two religious leaders in Portsmouth, Virginia.  Dr. Hawthorne had provided personal and spiritual guidance and counseling to Richardson and his wife for "many years."  And Bishop Brown is the leader of the church where Richardson and his wife attend services.  Dr. Hawthorne's letter explained that Richardson's objection was "consistent with biblical scripture, tenets, and Christian ideology," stating that the vaccine mandate and repercussions for failure to adhere to the mandate were "akin to biblical scripture in Revelations 13:16-18 which describes the requirement to receive the Mark of the Beast in order to buy or sell to survive."

The NBA contends that Richardson's objection to vaccination is fundamentally secular and political.  It argues that the letters from the two religious leaders "at their core

articulated secular concerns about the vaccine," such as objections to "government mandates as a means of accomplishing further compliance by citizens in the future."  It points as well to text messages Richardson sent in which he expressed secular reasons for not receiving the COVID-19 vaccine.  It also seeks deference to the decision from the VEB, as highly probative.

This dispute regarding the sincerity of Richardson's religious beliefs is not susceptible to summary judgment.  It is for the jury to resolve.  See Gardner-Alfred, 143 F.4th at 64-65.

B.   Undue Hardship

Next, the NBA argues that permitting Richardson to work unvaccinated would have posed an undue hardship on the NBA.  The NBA has shown that there is no genuine dispute of material fact regarding that undue hardship from at least early December 2021.

If an employee establishes a prima facie case of religious discrimination, the employer must offer a reasonable accommodation, "unless doing so would cause the employer to suffer an undue hardship."  Russo, 129 F.4th 186 (citation omitted).  A proposed accommodation "constitutes an undue hardship when it poses a burden that is substantial in the overall context of an employer's business."  Id. (citation

18

omitted).  The undue hardship inquiry is "fact-specific" and it "takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of an employer."  Groff v. DeJoy, 600 U.S. 447, 468, 470-71 (2023) (citation omitted).  Moreover, "[b]ecause the 'conduct of [a] business' plainly includes the management and performance of the business's employees, undue hardship on the conduct of a business may include undue hardship on the business's employees."  Id. at 475 (Sotomayor, J., concurring); see also Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 79-81 (1977) (depriving employees of bargained-for seniority rights constitutes undue hardship).

The NBA has shown that vaccination of its referees against COVID-19 was necessary to protect the health of referees and other game participants and to minimize the likelihood of game postponements.  Undisputed testimony and other evidence show that the NBA reasonably believed that the Omicron variant, which was identified in the Fall of 2021, increased the risk of infection with and transmission of COVID-19, and thereby increased the risk of substantial disruption to the NBA's business.  Accordingly, it required all of its referees to be vaccinated against the virus as the most effective means of

19

protecting the health of everyone and the continuity of its
operations.

It is undisputed that NBA referees travel by commercial
flight to basketball games throughout the United States and
Canada.  While in a given city, NBA referees typically stay in a
hotel and use rental cars, rideshare apps, or other car services
to travel to the indoor arena at which NBA games are played.
NBA games last hours and require referees to interact closely
with other referees and with NBA players and coaches.  It is
additionally undisputed that NBA referees cannot wear masks
while officiating basketball games.

In addition to their on-court duties, NBA referees also
work occasionally in the "NBA Replay Center."  The NBA Replay
Center is an enclosed indoor space where referees and other NBA
staff work during basketball games to review, by video, calls
made by referees who are officiating on the court.

Before the emergence of the Omicron variant, the NBA had
executed the August 28, 2021 COVID Agreement.  That Agreement
allowed referees to apply for an exemption from the NBA's policy
that all referees much be vaccinated against COVID-19.  Stern --
the NBA's Senior Vice President and Assistant General Counsel --
explained that, from then until at least "early November" 2021,

20

"a referee would have been able to continue their employment if
they were granted an exemption" to the NBA's vaccine mandate.

Later that Fall, however, the situation changed.  On
November 30, 2021, the United States designated Omicron as a
"Variant of Concern," and on December 1, 2021 the first
confirmed case of Omicron was identified in the United States.
It was more infectious than previous variants and was associated
with an increase in reported COVID-19 infections in the United
States throughout 2022.

The NBA's medical advisors consistently reviewed and
relied upon scientific research and literature concerning COVID-
19, as well as recommendations from government agencies.  In
both 2021 and 2022, the NBA understood that the COVID-19
vaccines proved effective in reducing infection rates.  In
October 2021, published data from state and local governmental
agencies demonstrated that unvaccinated individuals had five
times the rate of COVID-19 infection compared to fully
vaccinated people.  That differential remained significant.
Data published in September 2022 showed that unvaccinated
individuals had three times the rate of COVID-19 infection
compared to fully vaccinated people.  In 2021, data also showed
that vaccinated individuals who developed COVID-19 also had, on
average, reduced viral loads and were potentially less likely to

spread the infection.  Considering such data, government
agencies, including the World Health Organization and the
Centers for Disease Control ("CDC"), communicated during this
time that vaccination decreased the likelihood that an
individual would pass on the virus to others.  The NBA
understood as well that alternative prevention policies, such as
testing, did not prove as effective at preventing COVID-19
transmission when compared with vaccination.

Relatedly, it was reported during this time that vaccines
reduced the risk of severe illness from COVID-19 and death.  In
October 2021, data from state and local government agencies
showed that the death rate for unvaccinated individuals was
sixteen times higher than the death rate for vaccinated
individuals.  And in September 2022, the death rate for
unvaccinated individuals was five times higher than the death
rate for vaccinated individuals.

The NBA's experience with COVID-19 reflected the
difficulties of managing a highly transmissible virus in a sport
that is played indoors.  During the 2020-21 season, the NBA had
postponed 31 games due to COVID-19-related exposure events.
Postponing and rescheduling NBA games imposes increased travel
and hotel costs, can disappoint fans who may not be able to
attend or watch a rescheduled game, and can reduce media revenue

if a game is rescheduled to a night where a game cannot be
nationally televised.  It can also result in games played on
back-to-back nights, resulting in less opportunity for players
to rest and recover from game play, risking both player injury
and lower quality play.

By "mid to late November" or "early December," Stern's
understanding based on the advice of the NBA's medical advisors
was that "it was not safe for an unvaccinated referee,
regardless of the reason they were unvaccinated, to work."  The
NBA acted on this understanding.  During the 2021-22 season
there was no NBA referee with an approved medical or religious
exemption to the COVID vaccine requirement, but there was a
minor league referee to whom a religious exemption had been
granted.[2]  On December 22, 2021, the NBA Services Corp. informed
that NBA minor league referee that, following consultation with
medical experts and notwithstanding previously agreed to health
and safety protocols, "there is no manner for you to safely
participate in the 2021-22 [season]" without vaccination against
COVID-19.

The NBA continued its vaccine mandate following the
conclusion of the 2021-22 season.  On June 10, 2022, Dr. Sims

---

[2] The "G League" is minor league of the NBA, which the NBA
Services Corp. also operates.

explained in writing that the NBA's policy "remains that officials must be fully vaccinated" to "work on the court."  He summarized the NBA's view that "[t]esting, while effective at detecting cases, is not preventative and does not always capture cases before transmission has occurred."  Accordingly, Dr. Sims stated that, based on "guidance from the CDC and [the NBA's] experts in infection disease and epidemiology", the NBA had concluded that the minor league referee who had previously received an exemption to the vaccine requirement "should not be allowed to work Summer League games unless he is fully vaccinated."

Thus, by no later than early December 2021, the NBA understood, based on scientific evidence and medical advice regarding the COVID-19 pandemic, that permitting unvaccinated referees to work would increase the likelihood of COVID-19 infection and transmission among players and other staff and the risk of game cancellations and postponements.  This is a risk that the NBA decided it could not incur.  It constitutes an undue hardship.

Richardson advances several arguments resisting the entry of summary judgment for the NBA on the basis of undue hardship. None is persuasive.

First, Richardson contends that the NBA cannot establish
undue hardship because, in crafting the COVID Agreement, the NBA
"pre-negotiated" the accommodations for referees with approved
religious exemptions.  The NBA was not bound forever by the
accommodation analysis it conducted in August 2021.  The undue
hardship inquiry is fact-specific and requires an assessment of
the burden in the "overall context of an employer's business."
Groff, 600 U.S. at 468.  That context may change.  The COVID
Agreement itself explicitly recognized the unknown evolution of
the pandemic.  It acknowledged that the NBA and NBRA would
"confer periodically to reassess the protocols and appropriate
protections" for referees in light of, among other things,
COVID-19 infection rates, vaccine efficacy against new COVID-19
variants, and the number of game participants who were fully
vaccinated.  Accordingly, the NBA was bound neither by law nor
the Agreement to its decision in August 2021 that a referee with
an approved exemption from vaccination would be allowed to
continue his employment, subject to prescribed health and safety
protocols.  It was entitled, as it did, to reevaluate as the
pandemic evolved whether it could continue to accommodate a
referee with a bona fide religious exemption from vaccination
without incurring an undue hardship.

Richardson speculates that the COVID Agreement's health and safety protocols may have remained in effect for the duration of the 2021-22 occasion since there is no written revocation of the Agreement. He has provided no evidence to support that speculation. The NBA had no occasion to formally withdraw the Agreement because it had granted no medical or religious exemptions to NBA referees. The undisputed testimony from its executives and its treatment of the minor league referee establish that the NBA had changed its vaccine accommodation policy no later than early December 2021.

Richardson next argues that the COVID Agreement's protocols were state of the art and "equally safe" to vaccination. In making this argument, he relies on the testimony provided by Dr. Michelle McDade, an expert for the plaintiff. But it is undisputed that in 2021 and 2022 the NBA's medical advisors were not telling the NBA that the protocols were "equally safe." Their advice was that vaccination was more effective than testing both in preventing infection and in reducing the spread of the virus. And as Dr. McDade and Richardson admitted, COVID-19 testing only provides a reading in the moment the test is taken and can be compromised by human error. This increases the likelihood, even if only on the margins, that a referee could test negative before a game but be infectious during the game.

26

Richardson contends that the NBA cannot establish that the accommodation of an unvaccinated referee would have caused an undue hardship unless it can quantify the precise risk associated with permitting unvaccinated referees to work. Richardson identifies no legal authority imposing this requirement on a business and this Court has found none.  Such a requirement is particularly inappropriate where, as here, the burden at issue concerns significant risk to the health of employees and others and a substantial cost to an entire business enterprise.

III. Dr. Risch's Testimony

While Richardson's memorandum in opposition to the motion for summary judgment does not rely on the report provided by his expert Dr. Harvey Risch ("Report"), the plaintiff does rely on the Report in its counter-statement to the NBA's Rule 56.1 Statement.  Dr. Risch's Report was tendered by Richardson as relevant to the issue of undue hardship and the NBA has moved to exclude the Report.  For the reasons that follow, the NBA's motion is granted.

Federal Rule of Evidence 702 governs the admission of expert testimony in federal court.  The Supreme Court has instructed that the district court has a "gatekeeping" function under Rule 702: it is charged with the "task of ensuring that an

expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993).

Testimony is relevant where it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002) (citation omitted). And to determine whether testimony has a sufficiently reliable foundation to be admissible at trial, a court must consider the "indicia of reliability identified in [Rule] 702." Clerveaux v. East Ramapo Central School District, 984 F.3d 213, 233 (2d Cir. 2021) (citation omitted).

Rule 702 allows a "witness who is qualified as an expert by knowledge, skill, experience, training, or education" to testify, "in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that":

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and

      (d) the expert's opinion reflects a reliable
application of the principles and methods to the facts
of the case.

Fed. R. Evid. 702.

In addition to those indicia of reliability set forth in Rule 702, a trial court may consider the criteria enumerated in Daubert, "some or all of which might prove helpful in determining the reliability of a particular scientific theory or technique." Clerveaux, 984 F.3d at 233 (citation omitted). The Daubert factors are: (1) whether the methodology or theory has been or can be tested; (2) whether the methodology or theory has been subjected to peer review and publication; (3) the methodology's error rate and the existence and maintenance of standards controlling the technique's operation; and (4) whether the methodology or technique has gained general acceptance in the relevant scientific community. Daubert, 509 U.S. at 593-94, "[W]hile a court need not consider the Daubert factors, it does not abuse its discretion in doing so." In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II), 982 F.3d 113, 124 (2d Cir. 2020) ("Mirena II"). Although "Rule 702 sets forth specific criteria for the district court's consideration, the Daubert inquiry is fluid and will necessarily vary from case to case." Id. at 123 (citation omitted).

"[I]n deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." Id. (citation omitted). Ultimately, a court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Company, Ltd. v. Carmichael, 526 U.S. 137, 152 (1999).

Dr. Risch is a Professor Emeritus of Epidemiology at Yale School of Public Health. The majority of his career has focused on cancer and its causation. In May 2020, he published a paper on early treatment of high-risk COVID-19 outpatients. Since that time, he has co-authored other papers on COVID-19, which he describes as focusing on early outpatient management.

At a general level, the Report is critical of the government's management of the COVID-19 pandemic. Dr. Risch believes that the spread of infection is inevitable and post-infection natural immunity is a public good. He believes that the pandemic should not have been managed by tracking infection but rather by tracking deaths, hospitalization, and the

30

incidence of serious long-term syndromes caused by infection. Accordingly, he asserts, governments, businesses and schools should not have mandated vaccination to prevent the spread of infection.

Dr. Risch defines the question at hand as whether vaccine mandates actually reduce transmission of COVID-19 more effectively than a policy of recommending vaccination. He observes that CDC data showed that vaccination reduced infection risk in the first half of 2021, but also that it was increasingly failing to do so by the second half of 2021. He points out that the CDC Director publicly confirmed in August of 2021 that persons who receive a COVID-19 vaccine and are asymptomatic can still pass on the virus to others. Thus, while vaccination may reduce the severity of symptoms, Dr. Risch opines, it does not prevent transmission. Indeed, 87% of Americans eventually became infected. Relatedly, Dr. Risch asserts that COVID-19 vaccination mandates, including the NBA mandate, "ignored" the role that post-infection natural immunity plays in helping to control the adverse consequences of the pandemic. Relying on published studies, he concludes that post-infection immunity reduced the risk of reinfection and of severe disease. Dr. Risch points to studies which he regards as showing that post-infection immunity was more protective against

31

subsequent infection and serious disease than a vaccination
without a prior infection.

Insofar as the NBA is concerned, Dr. Risch observes that by
December 2021, the NBA had added a booster dose requirement to
its mandate.  Nonetheless, NBA referees and players, almost all
of whom were vaccinated, caught COVID-19 during the 2021-22
season.  Dr. Risch concludes that, given the small number of NBA
staff seeking a religious exemption, even if all had gotten
COVID-19, the infection burden would have been less than the
breakthrough infection burden among the vaccinated referees.

The NBA moves to preclude the entirety of the Report.  It
contends that the Report contains opinions that are irrelevant,
reflects legal conclusions, includes unreliable recitations of
scientific studies, or should be excluded pursuant to Rule 403.
Each of these points is well taken.

    A.   Relevance

The NBA argues that many of Dr. Risch's opinions are
irrelevant.  According to the NBA, the issue for the jury will
be whether it reasonably relied on health authority guidance for
the 2021-22 season and has carried its burden to show that
allowing exemptions to its vaccination policy would have imposed
an undue hardship.  Accordingly, the NBA seeks to strike Dr.
Risch's disagreements with the advice given by government

agencies regarding COVID-19 and the data presented by government health authorities.  For instance, Dr. Risch takes issue with whether the government data was accurate and argues that the government should have focused more on issues such as post-infection natural immunity or developed incentives for vaccination.

The NBA is correct.  All or virtually all of Dr. Risch's proffered testimony is irrelevant.  Although Dr. Risch is offered as a witness on the issue of undue hardship, he does not offer any opinion on the negative impact that game postponement, rescheduling, and cancellation would have on the NBA and those involved in NBA games.  Nor does he dispute that the Omicron variant of the COVID-19 virus was considered even more transmittable than prior variants.  His disagreements with public health management of the pandemic are irrelevant to the particular issues that created hardship for the NBA and the reasonableness of the NBA's reliance on its experts in 2021 and 2022.  Indeed, in his deposition, Dr. Risch admitted that it was not unreasonable for employers to rely on the government's information.  He explained nonetheless that there was additional information available and he objects to employers placing "sole" reliance on government information.

The NBA seeks to strike as well those opinions which rely on studies published after the 2021-22 season as irrelevant to the NBA's determination by December 2021 to insist that its referees be vaccinated. It is correct. Although Dr. Risch indicates that he is relying on later studies only to confirm his opinion, without those later studies it is unclear whether Dr. Risch had any reliable basis in the Fall of 2021 for a different opinion than the one offered by the NBA's medical consultants. Citation to those later studies becomes at best confusing.

B. Legal Conclusion

The NBA additionally seeks to exclude Dr. Risch's Report to the extent it offers legal conclusions. As an example of such inadmissible testimony, the NBA points to Dr. Risch's opinion that allowing Richardson to work without a vaccination did not constitute an undue hardship when measured against the Equal Employment Opportunity Commission ("EEOC") guidelines.

The NBA is correct that the plaintiff's expert cannot offer such opinions to the jury. In opposition to this motion, Richardson agrees that Dr. Risch cannot testify to the legal conclusions in his Report.

C. Reliability

The NBA seeks to strike much of the Report as unreliable. It explains that Dr. Risch has rejected nearly all of the studies that were available during the 2021-22 season and has relied instead on a 2024 "pre-print" study -- i.e., a study that is shared publicly but not peer-reviewed -- to conclude that vaccinations were not as effective as they were believed to be through 2022. During his deposition Dr. Risch admitted that the majority of studies published as of October 2021 supported the efficacy of the vaccine.

The NBA also contends that Dr. Risch has selectively pointed to passages in studies to reach conclusions different from what the authors of the study concluded, and has done so without an adequate explanation. For example, to support his opinion that vaccines were failing to suppress the spread of infection in 2021, he relies on Madewell[3], a peer-reviewed meta-analysis published on April 28, 2022. According to Dr. Risch, Madewell indicates that "by the latter half of 2021" two doses of the COVID-19vaccines "lost most of their ability to reduce risk of infection transmission." While Madewell acknowledged that COVID-19 vaccines became less effective in reducing the

---

[3] See Zachary J. Madewell, et al., Household Secondary Attack Rates of SARS-CoV-2 by Variant and Vaccination Status: An Updated Systematic Review and Meta-analysis, JAMA Network Open, April 28, 2022, https://jamanetwork.com/journals/jamanetwork open/fullarticle/2791601.

spread of new variants, it distorts Madewell to cite it for the proposition that vaccines had "lost most of their ability" to suppress the spread of infection.  Madewell analyzed 135 studies and concluded that "Full vaccination reduced susceptibility and infectiousness, but more so for Alpha than Delta and Omicron." Madewell at 1.

As another example, Dr. Risch relies on the Leon[4] as support for his view that natural immunity is more effective than vaccination in preventing reinfection.  This is an egregious example of cherry-picking.  Leon reported on data from New York and California for a diagnosis of COVID-19 infection ("cases") and hospitalizations.  It compared rates between those vaccinated and unvaccinated, including whether they had a previous COVID-19 diagnosis.  It admitted that its analysis was conducted before the emergence of Omicron and therefore its conclusions regarding immunity "might be diminished."  Id. at 131.  It concluded nonetheless that "vaccination remains the safest and primary strategy to prevent SARS-CoV-2 infections, associated complications, and onward transmission."  Id. Finally, it noted that the CDC's Advisory Committee on

---

[4] Tomás M. León, et al., COVID-19 cases and hospitalizations by COVID-19 vaccination status and previous COVID-19 diagnosis – California and New York, May–November 2021, CDC Morbidity and Mortality Weekly Report, January 28, 2022, https://www.cdc.gov/mmwr/volumes/71/wr/pdfs/mm7104e1-H.pdf.

Immunization Practices recommended that all eligible persons be up to date with vaccinations, which provide "the most robust protection against initial infection, severe illness, hospitalization, long-term sequelae, and death." Id.

While cross-examination is an appropriate method for demonstrating the limitations in an expert's analysis, before that analysis may be admitted at trial, its proponent must still show that it is sufficiently reliable to pass muster under Rule 702 and Daubert. Clerveaux, 984 F.3d at 233. This Richardson has not done.

In opposing this motion, Richardson points to only three studies that he argues are relevant and appropriate support for Dr. Risch's opinion: Madewell, which is discussed above, Puhach[5] and the pre-print Riemersma[6]. As already explained, Madewell does not support the proposition for which Dr. Risch seeks to use it.

Puhach was not published until March 2023 and therefore would not have been available to the NBA when it made its

---

[5] Olha Puhach, et al., SARS-CoV-2 viral load and shedding kinetics, Nature Reviews Microbiology, March 2023, https://pmc.ncbi.nlm.nih.gov/articles/PMC9716513/pdf/41579_2022_Article_822.pdf.

[6] Kasen K. Riemersma, et al., Vaccinated and unvaccinated individuals have similar viral loads in communities with a high prevalence of the SARS-CoV-2 Delta variant, medRxiv, July 31, 2021. https://doi.org/10.1101/2021.07.31.21261387.

decision to no longer permit unvaccinated referees to work.  In
any event, Dr. Risch describes Puhach as reporting in 2023 that
vaccinated individuals who were infected cleared their
infections "roughly 27% sooner" than unvaccinated individuals.
If anything, that statistic supports adoption of a vaccination
requirement.  Puhach's conclusion does as well.  It reported,
even though society was entering its third year of the pandemic,
that "no diagnostic tests exist that reliably determine the
presence of infectious virus."  Id. at 158.

Finally, Riemersma, according to Dr. Risch, indicated that
those infected during the period in which the Delta variant was
prominent, had "similar" viral loads whether or not they had
been vaccinated.  Riemersma at 9.  That is an accurate
description of Riemersma.  But this study, which was not peer
reviewed, does not undercut the advice the NBA's experts
provided to it, much less the recommendations of the CDC.  It
does not take issue with the data showing that vaccination
reduced the risk of infection.  Instead, Riemersma measured
viral loads among those who became infected and were
symptomatic.  Riemersma compared vaccinated and unvaccinated
individuals infected with the Delta variant to determine whether
individuals with vaccine breakthrough infections could shed
Delta viruses at a level consistent with potential transmission.

Id. at 3.  It concluded that vaccinated individuals can shed and potentially transmit infectious virus and should be tested when symptomatic or after close contact with someone diagnosed with COVID-19.  Id. at 8.

In sum, Dr. Risch has not employed the same level of intellectual rigor that characterizes the practice of an infectious disease expert generally or an expert in the COVID-19 virus.  His opinions must therefore be stricken as well for their lack of reliability.

D.    Rule 403

Finally, the NBA argues that the Report must also be stricken pursuant to Rule 403.  Under Rule 403, courts may exclude relevant evidence "if its probative value is substantially outweighed" by a danger of confusing the issues or misleading the jury.  Fed. R. Evid. 403.  Both of these dangers exist here.

Dr. Risch's analysis creates a substantial risk of confusing and misleading the factfinder.  In deciding whether the NBA has carried its burden of showing that an accommodation of Richardson would have created an undue hardship, jurors must focus on what the relevant scientific community and the NBA understood of the COVID-19 virus and the efficacy of vaccines and testing in the 2021-22 season, particularly during the late

39

Fall of 2021.  Dr. Risch's criticism of public health
authorities' recommendations in the midst of a pandemic,
especially when based on a few hand-picked studies that post-
date the period in which the NBA made its decision, has limited
to no probative value.  Admission of his testimony risks
misleading and confusing the jury as to the relevant standard
for determining undue hardship and the relevant evidence on
which to base its verdict.

IV.  Mitigation of Damages

    Richardson seeks, among other things, back and front pay.
The NBA contends that Richardson is precluded from seeking
either back or front pay because he made no effort to mitigate
his damages by seeking other employment.  The NBA's motion is
granted.

    An employee discharged in violation of Title VII has an
obligation to mitigate his damages.  See Shultz v. Congregation
Shearith Israel of City of New York, 867 F.3d 298, 306 (2d Cir.
2017).  This requires a plaintiff to exercise "reasonable
diligence in finding other suitable employment."  Ford Motor Co.
v. Equal Employment Opportunity Commission, 458 U.S. 219, 231
(1982); see also 42 U.S.C. § 2000e-5(g)(1).  Work is "suitable"
where it is "substantially equivalent" to the work the plaintiff
was denied.  Ford Motor Co., 458 U.S. at 231-32.  A plaintiff

"need not go into another line of work, accept a demotion, or take a demeaning position." Id. at 231.

Generally, an employer seeking to avoid a lost wages award "bears the burden of demonstrating that a plaintiff has failed to satisfy the duty to mitigate." Broadnax v. City of New Haven, 415 F.3d 265, 268 (2d Cir. 2005). "This may be done by establishing (1) that suitable work existed, and (2) that the employee did not make reasonable efforts to obtain it." Id. (citation omitted). An employer, however, "is released from the duty" to establish the availability of suitable employment "if it can prove that the employee made no reasonable efforts to seek such employment." Id. (citation omitted). If an employer meets its burden of showing a failure to seek alternative employment, "the burden shifts to the plaintiff to show that compensation for [alternative] employment is not comparable and thus the plaintiff is entitled to limited damages." Id. at 270 (citation omitted).

It is undisputed that Richardson made no effort to seek other employment and thus to mitigate his damages. The burden thus shifts to Richardson to show that the compensation from alternative, suitable employment was not comparable to his NBA compensation and that he is entitled to the difference. Richardson has failed to carry that burden and also failed to

41

present evidence from which a jury could calculate any award of damages to him.

To begin with, the NBA has produced evidence of several kinds of work that are available to a former NBA referee: refereeing in other professional and amateur leagues; refereeing at the collegiate level; performing consulting work for professional or amateur basketball teams; running a referee camp or educational service; and working in television as an analyst. Other former NBA referees have gone on to do these kinds of work, including one who started a consulting business for basketball referees.

Richardson does not dispute that the work the NBA identifies exists.  Instead, he advances two arguments, supported by his own declaration and the declarations of two other NBA referees.  First, he contends that some of the work the NBA identifies had lower pay or less prestige.  For example, Richardson contends that collegiate referees are independent contractors who receive no benefits and who earn less than half Richardson's former salary.  Second, Richardson asserts that even if work the NBA identifies was suitable, it would have been difficult to obtain the work at this late stage in his career and that certain roles are "rarely available" and are not posted publicly.

42

Richardson was not excused from conducting a search because he judged his prospects of securing employment to be poor: A Title VII claimant's burden to use reasonable diligence in finding other suitable employment "is not onerous" and it "does not require him to be successful in mitigation." Dailey v. Societe Generale, 108 F.3d 451, 456 (2d Cir. 1997) (citation omitted). Work as a referee, as well as consulting or broadcast work related to basketball and refereeing, is suitable, alternative work. It is not another line of work, a demotion, or demeaning. If he had found work at which he would have earned less than he did as an NBA referee, he would have been entitled to the difference in compensatory damages. Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 54 (2d Cir. 1998). As it is, Richardson neither looked for work nor has he presented evidence from which a jury could calculate an amount of compensatory damages by comparing the income and benefits from other suitable employment and his NBA salary and benefits. Accordingly, Richardson's claim for back and front pay is stricken.

V. Richardson's Motion for Summary Judgment

Richardson moves for summary judgment on two issues: that he has established that his objection to the vaccine mandate was based on sincerely held religious beliefs, and that the NBA's

undue hardship defense fails as a matter of law.  His motion is denied.

As explained in discussing the NBA's motion for summary judgment, there exists a dispute of material fact as to whether Richardson's objection to the vaccine mandate is based on sincerely held religious beliefs.  A jury could conclude that Richardson was hiding secular concerns behind a "veil of religious doctrine."  Gardner-Alfred, 143 F.4th at 64.

As to undue hardship, Richardson argues that the NBA "pre-negotiated" the appropriate accommodations for referees with approved exemptions in the COVID Agreement.  He emphasizes that when it entered the COVID Agreement, the NBA already understood that unvaccinated referees had a "greater likelihood" of getting and transmitting COVID-19.  But as explained above, the NBA was entitled both under the COVID Agreement and as a matter of law to continue analyzing, as the pandemic evolved, what accommodations it could provide without incurring an undue hardship.

Richardson relatedly argues that, having allowed unvaccinated referees to participate in games during the 2020-21 season, it has failed to show that it could not do so the following season.  The NBA's choices during the 2020-21 season -- before vaccines were available and before the emergence of the

Omicron variant -- do not entitle Richardson to summary judgment on the NBA's undue hardship defense.  It is worth noting, moreover, that the pandemic had a very substantial impact on the NBA's operations during the 2020-21 season.  It shortened the season and more than 30 games were postponed.  If anything, the experience of that season strongly supports the NBA's change in strategy the following season.

Richardson next points to the fact that the NBA did not impose a vaccination requirement on the NBA players and that some small number of players did not get vaccinated.  This comparison is inapposite.  Among other things, the plaintiff does not contend that the NBA had the ability to unilaterally impose a vaccine requirement on the players.

Finally, Richardson contends that the NBA could have placed him on an indefinite paid or unpaid leave of absence.  Employers are not required to place employees on an indefinite leave of absence.  See Vangas v. Montefiore Med. Ctr., 823 F.3d 174, 181 (2d Cir. 2016) (an indefinite leave extension is not a reasonable accommodation for a disability).  An indefinite leave would be particularly burdensome here.  The NBA had no ability to predict the course of the pandemic at the conclusion of the 2021-22 season.  As a matter of law, Richardson was not entitled to such an accommodation.

## Conclusion

The plaintiff's February 20, 2025 motion for summary judgment is denied.  The defendants' February 28, 2025 motion to exclude the testimony of Dr. Risch is granted and their motion for summary judgment is granted in part.  The defendants are granted summary judgment (1) on the plaintiff's Title VII claim for the period following early December 2021 on the ground that permitting Richardson to referee NBA games would have placed an undue burden on the defendants, and (2) on the plaintiff's request for back and front pay.

Dated:    New York, New York
          August 18, 2025

_____
DENISE COTE
United States District Judge